CONDIT, Appellant,

v.

CLERMONT COUNTY REVIEW et al., Appellees.

[Cite as *Condit v. Clermont Cty. Review* (1996), 110 Ohio App.3d 755.]

Court of Appeals of Ohio,
Twelfth District, Clermont County.

No. CA95–09–060.

Decided April 29, 1996.

756

*Thomas W. Condit*, for appellant.

*Keating, Muething & Klekamp* and *Richard L. Creighton, Jr.*, for appellees.

Walsh, Presiding Judge.

Plaintiff-appellant, James J. Condit, Sr., appeals a decision of the Clermont County Court of Common Pleas granting summary judgment in favor of defendants-appellees, the Clermont County Review, the Mt. Washington Press, Nichols

Publishing Co., Inc., Dennis A. Nichols, individually and as publisher of the Clermont County Review and the Mt. Washington Press, and Anita M. Nichols, individually and as editor of the two papers.

In late 1978 or 1979, appellant's son, James Condit, Jr. ("Condit, Jr.") joined with a small group of people to form an organization called the "Cincinnatus Party." The purpose of the organization, which was not officially a political party, was to field a slate of antiabortion candidates for the 1979 Cincinnati city council elections. Although appellant was not a founding member of the organization, he and his wife provided it with financial and moral support. Appellant, who is an attorney, also represented the Cincinnatus Party when it was involved in litigation. As a result of the litigation, appellant attended some organizational events and became "very visible" in his association with the organization.

In 1989, Condit, Jr. entered the race for election to the Cincinnati City Council as the candidate from the Cincinnatus Party. On November 1, 1989, appellee, Dennis Nichols ("Nichols"), published an editorial in the Mt. Washington Press about the city council election in which he discussed the upcoming election and the candidates, including Condit, Jr. Concerning Condit, Jr. and appellant, Nichols wrote:

"[Condit, Jr.'s] political party consists largely of his father and himself * * *. It started out as a single-issue anti-abortion effort, but responsible pro-lifers quickly disavowed all connection with the Condits. They would be dangerous if they could."

In 1989 and 1990, appellant was engaged in his own political contests and ran for the position of chairman of the Hamilton County Republican Party representing a group known as the Platform Republicans. The Platform Republicans were a group of Hamilton County Republicans who wanted the local party to adopt the National Republican Party platform, especially as it concerned abortion. Appellant lost both races.

On April 25, 1990, just before the May Republican primary, the Mt. Washington Press and the Clermont County Review published a second editorial by Nichols concerning the Condits. The editorial stated:

"These people are anti-abortionists whom even Right to Life shuns.

" * * *

"The Condits follow the path of a European ideology of church, tribe, tradition, and authority. The word is overused, but they're fascists.

"Moreover, the Condits' fascism—James Jr.'s on documented evidence—bears that characteristic bond of malcontents through the ages: anti-Semitism. When they lose their struggles, they blame the Jews.

" * * *

"The Condits call themselves conservative Catholics and fancy themselves defenders of the faith. But the ideas they extol have done immeasurable violence over the centuries both to the Jewish people and to the Roman Catholic Church.

" * * *

"But the Condits soil what they touch. Their campaign is not reform, it's infiltration. Were the Condits to gain a strong voice in any party, their voice would destroy that party."

A few months later, in October 1990, appellant filed a four-count complaint initiating this action. In counts one and three, appellant alleged that the above-cited portions of the November 1, 1989 and April 25, 1990 editorials written by Nichols were defamatory. Appellant also asserted two counts—one per article—of intentional infliction of emotional distress.

After the complaint was filed, appellees published two articles, one on November 14, 1990 and one on June 3, 1992, concerning the lawsuit. The articles were written by Greg Flannery, a reporter for the paper, and approved by Nichols. Both articles repeated some of the allegedly libelous comments made by Nichols.

Finally, on May 27, 1992, the Mt. Washington Press published a third editorial written by Nichols concerning the Condits. In that article, according to appellant, Nichols again repeated libelous statements and "maliciously attribut[ed] falsity evil" to appellant. In that editorial, Nichols stated that, although appellant denied being anti-Semitic, he has "a long history of supporting his son * * * despite the younger Condit's crackpot statements and fomenting of hate."

Appellant then amended his complaint to include three additional causes of action for defamation and intentional infliction of emotional distress based on the three publications that followed the filing of the original complaint.

Appellees moved for summary judgment on all ten causes of action in the complaint. On July 16, 1993, the trial court granted summary judgment to appellees. Appellant appealed the decision to this court. We reversed the trial court, finding that genuine issues of material fact existed as to whether appellant demonstrated actual malice with sufficient clarity. However, we affirmed the trial court's determination that appellant was a public figure. See *Condit v. Clermont Cty. Review* (1994), 93 Ohio App.3d 166, 638 N.E.2d 96.

On July 28, 1995, appellees filed a renewed motion for summary judgment arguing, in essence, that based upon a recently decided Ohio Supreme Court case, *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182, the publications could not be considered defamatory. The trial court again granted appellees summary judgment and appellant filed this appeal.

Appellant presents three assignments of error for review. In his first assignment of error, appellant states that the trial court erred in granting appellees' renewed motion for summary judgment as to counts one and three of the complaint. Appellant alleges that statements from the November 1, 1989 editorial (count one) and the April 25, 1990 editorial (count three) were libelous. Appellant's argument is not well taken.

Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Civ.R. 56(C); *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881; *Harless v. Willis Day Warehousing Co., Inc.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46.

■■■ The Ohio Supreme Court recently reaffirmed that expressions of opinion are "generally protected under Section 11, Article I of the Ohio Constitution as a valid exercise of freedom of the press." *Vail,* 72 Ohio St.3d at 280, 649 N.E.2d at 184, citing *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 244–245, 25 OBR 302, 303–304, 496 N.E.2d 699, 701–702. Because the Ohio Constitution provides a separate and independent guarantee of protection for opinion, see *Vail* at 281, 649 N.E.2d at 185, the question we must resolve is whether the allegedly defamatory statements in this case are fact or constitutionally protected opinion. The determination of whether allegedly defamatory language is opinion or fact is a question of law to be decided by the court. *Id.* at 280, 649 N.E.2d at 184.

■■■ To determine whether a statement is fact or opinion, Ohio courts employ a "totality of the circumstances" test. *Id.* at 282, 649 N.E.2d at 185. Under this test, courts should consider "the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared." *Id.* at 282, 649 N.E.2d at 185, citing *Scott* at 250, 25 OBR at 308, 496 N.E.2d at 706. This is not a "bright-line" test; instead, the standard is fluid. The facts of each case must be analyzed in the context of the general test. *Vail.* "Each of the four factors should be addressed, but the weight given to any one will conceivably vary depending on the circumstances presented." *Vail* at 282, 649 N.E.2d at 185.

Applying the above test to the facts of this case, we look first at the specific language complained of by appellant in counts one and three of the complaint. The question we must ask is whether the ordinary reader would understand the words used to be "of a factual nature or hype and opinion." *Id.* Is the meaning "readily ascertainable" or is it "ambiguous?" *Id.*

We conclude that the statements in counts one and three do not have a sufficiently definite meaning to support a claim of libel. See *Ollman v. Evans* (C.A.D.C.1984), 750 F.2d 970, 980–981. The statements in counts one and three that "responsible Pro–Lifers quickly disavowed all connection with the Condits"

and "[t]hese people are anti-abortionists whom even Right to Life shuns" are phrases that possess a highly variable meaning, depending upon who the reader is. It is virtually impossible to determine who is meant by the terms "responsible Pro–Lifers" and "Right to Life" or what actions constitute "disavowal" or "shun[ning]." In addition, the statement in count one that the Condits "would be dangerous if they could," like the statements in count three that "the Condits soil what they touch," and "[w]ere the Condits to gain a strong voice in any party, their voice could destroy that party" can only be understood by a reasonable reader to be opinion. See *Vail,* 72 Ohio St.3d at 283, 649 N.E.2d at 186.

Count three also contains descriptions of the Condits as "fascists" and anti-Semites, *e.g.,* "the Condits' fascism * * * bears that characteristic bond of malcontents through the ages: anti-Semitism. When they lose their struggles, they blame the Jews;" and "the ideas they extol have done immeasurable violence over the centuries, both to the Jewish people and to the Roman Catholic Church."

Numerous courts have concluded that allegations of fascism, anti-Semitism, or other accusations of ethnic bigotry are not actionable as defamation. See, *e.g., Buckley v. Littell* (C.A.2, 1976), 539 F.2d 882, 891–895 (the word "fascist" is "loose" and "ambigu[ous]" and cannot be regarded as a statement of fact because of the "tremendous imprecision" of meaning and usage of the term); *Stevens v. Tillman* (C.A.7, 1988), 855 F.2d 394, 402 (the term "racist" is "hurled about so indiscriminately that it is no more than a verbal slap in the face * * * not actionable unless it implies the existence of undisclosed, defamatory facts"); *Raible v. Newsweek* (W.D.Pa.1972), 341 F.Supp. 804, 807 ("to call a person a bigot or other appropriate name descriptive of his political, racial, religious, economic or sociological philosophies gives no rise to an action for libel"); *Rambo v. Cohen* (Ind.App.1992), 587 N.E.2d 140, 148–149 ("the phrase 'anti-Semitic' * * * is not defamatory *per se* ").

Similar to the slurs in *Vail, e.g.,* "gay-basher," "neo-numbskull," "hate-monger[er]," the accusations in this case, *e.g.,* "fascist," "anti-Semite," contain elements of hyperbole and ambiguity that cause us to conclude that they fall within the realm of opinion and are not actionable as defamation.

■ We turn next to the question of whether the statements are verifiable. This question is a difficult one because most statements range over a continuum often containing discrete aspects which may be verified rather than "dividing neatly into categories of 'verifiable' and 'unverifiable.' " *Ollman,* 750 F.2d at 982. When the " 'statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content.' " *Vail* at 283, 649 N.E.2d at 186, quoting *Scott,* 25 Ohio St.3d at 251–252, 25 OBR at 309, 496 N.E.2d at 707.

In *Vail,* the court found that the terms "gay-basher," "neo-numbskull," and "hate-mongering" and descriptions of a candidate as "dislik[ing] homosexuals," "engag[ing] in an 'anti-homosexual diatribe,' " and of "foster[ing] homophobia" were not capable of verification because they were value-laden and "represent[ed] a point of view that is obviously subjective." *Id.* The only possibly verifiable fact in *Vail* was a reference to the plaintiff's honesty.

"A classic example of a statement with a well-defined meaning is an accusation of a crime" because such statements are " 'laden with factual content' that may support an action for defamation." *Ollman,* 750 F.2d at 980. By comparison, statements referring to appellant as someone who has been "shun[ned]," is a "fascist," "blame[s] the Jews," or "soil[s] what he touch[es]" are more akin to the phrases deemed nonactionable in *Vail* than they are to accusations of perjury or criminal misconduct, which are capable of proof or disproof in a court of law. Such words are too general to be verifiable and they do not imply undisclosed facts that would allow the statements to be verified. See *Celebrezze v. Netzley* (Aug. 4, 1988), Cuyahoga App. Nos. 53864, 53865, unreported, 1988 WL 87566. Accordingly, we do not find that the statements in counts one and three are verifiable.

Third, we look at the general context in which the statements appear. The statements were printed in editorials, not news stories. Editorials are, by definition, articles that express views and opinion, see Webster's Third International Dictionary (1981) 723, and are commonly understood to be so. In addition, the columns appeared in the midst of ongoing political campaigns which were the subject of the articles, as they were in *Vail.* See *Vail,* 72 Ohio St.3d at 282, 649 N.E.2d at 185–186.

Finally, we address the broader context in which the statements appeared. Courts have generally recognized the influence that certain types of writing have on readers' perceptions of whether a statement is opinion or fact. See *Ollman,* 750 F.2d at 983. In particular, "it is well understood that editorial writers and commentators frequently 'resort to the type of caustic bombast traditionally used in editorial writing to stimulate public reaction.' " *Id.* at 984, quoting *Natl. Rifle Assn. v. Dayton Newspapers, Inc.* (S.D.Ohio 1983), 555 F.Supp. 1299. Here, Nichols makes no attempt to hide his bias or to be impartial, nor is it likely that a reader would view his comments as an attempt at impartial reportage. See *Scott,* 25 Ohio St.3d at 253, 25 OBR at 310–311, 496 N.E.2d at 708. The statements are pointed, biting, and tough. They appear in columns of political commentary, and it is apparent that the writer's intent is to persuade readers to his point of view.

Based on the totality of the circumstances, therefore, we conclude that the reasonable or ordinary reader would understand Nichols's columns to be opinion

and not fact. As such, the statements are protected under Section 11, Article I of the Ohio Constitution.

The republication of these constitutionally protected opinions forms the basis of appellant's fifth and ninth causes of action. In his second assignment of error, appellant claims that the trial court erred in granting summary judgment as to these counts of the complaint. We agree with the trial court's assessment that "[n]o liability may arise from the accurate republication of constitutionally protected opinion." *Celebrezze,* Cuyahoga App. Nos. 53864, 53865, unreported. Nor can these constitutionally protected statements support a cause of action for intentional infliction of emotional distress as appellant claims in his third assignment of error. See *Vail,* 72 Ohio St.3d at 283, 649 N.E.2d at 186.

Based upon the foregoing, appellant's three assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment affirmed.*

WILLIAM W. YOUNG and POWELL, JJ., concur.