DECISION
This is an appeal by plaintiff-appellant, Benjamin C. Mallory, from a judgment of the Ohio Court of Claims rendered in favor of defendant-appellee, Ohio University, on plaintiff's claim for defamation.
On February 24, 1999, plaintiff filed a complaint, naming as defendant the state of Ohio. Plaintiff filed an amended complaint on March 22, 1999, naming as a defendant Ohio University. In the amended complaint, plaintiff alleged that he was formerly a student at Ohio University (hereafter "defendant"), and that he had been expelled from defendant's institution as a result of allegedly committing sexual battery against Audrey Delong, a student. The complaint alleged that the Athens County prosecutor subsequently dismissed all criminal charges against plaintiff. Plaintiff's complaint further alleged that Jeanine Woodruff and Heath Carfrey, both employees of defendant, uttered false and defamatory statements against plaintiff to the effect that plaintiff was guilty of sexual battery or other sexual misconduct.
By entry filed August 19, 1999, plaintiff and defendant stipulated that the conduct of Woodruff "was not manifestly outside the scope of her employment or official responsibilities," and the matter proceeded against defendant university on plaintiff's defamation claim. The matter came for trial before the court on June 12, 2000, on the sole issue of defendant's liability. The trial court issued a decision February 5, 2001, finding in favor of defendant. The court concluded that, based upon the totality of the circumstances, "the ordinary reader would view Woodruff's statements as opinion and not as fact." The decision of the trial court was journalized by judgment entry filed February 5, 2001.
On appeal, plaintiff sets forth the following single assignment of error for review:
 THE COURT OF CLAIMS MISINTERPRETED APPELL-ANT'S CLAIM AS DEFAMATORY LIBEL INSTEAD OF ONE BASED ON SLANDER AND CONSEQUENTLY FAILED TO APPLY THE RELEVANT LAW TO THIS CASE WHICH RESULTED IN PREJUDICIAL ERROR TO APPELLANT, ENTITLING HIM TO JUDGMENT IN HIS FAVOR AS A MATTER OF LAW.
Under his single assignment of error, plaintiff contends that the trial court erred in applying the law of libel, rather than the law of slander, in considering plaintiff's defamation claim. Plaintiff further argues that the court erred in concluding that a statement by one of defendant's employees constituted a constitutionally protected "opinion."
At the outset, we note the following facts, which are not disputed and are taken from the trial court's decision granting judgment in favor of defendant. In 1997, plaintiff was a student at defendant's institution; on the evening of November 19, 1997, plaintiff and another student, Audrey Delong, were at a local bar celebrating Delong's twenty-first birthday. Delong and some other friends had been drinking at the bar prior to plaintiff's arrival that evening. Plaintiff and Delong subsequently left the bar and walked to Delong's sorority house. According to plaintiff, both he and Delong were intoxicated at the time they left the bar.
Shortly after arriving at the sorority house, Delong had a brief argument with her "housemother" regarding the sorority house's policy forbidding male guests in the residence at night. Delong then left the sorority house with plaintiff, and they walked across campus to plaintiff's dormitory room where they began to engage in sexual conduct. While in the dormitory room, Delong became ill and vomited, and plaintiff and Delong decided to clean up in the dormitory showers. While they were in the showers, the couple engaged in further sexual conduct. Dormitory residents subsequently observed plaintiff and Delong in the shower area, and a resident advisor asked them to leave. According to witnesses, Delong was visibly intoxicated as she walked out of the shower.
The next morning, campus police questioned Delong about the events of the previous evening. Delong was counseled by Jeanine Woodruff, the assistant director of defendant's Department of Health, Education and Wellness ("HEW"). Delong informed the police and Woodruff that she did not remember any of the events that took place at the dormitory on the evening in question.
Plaintiff was subsequently charged with sexual assault under defendant's code of student conduct, and he was required to appear at a "judiciaries hearing." Following the hearing, plaintiff was found "responsible" on the sexual assault charge and he was expelled from the university.
Plaintiff was also indicted by an Athens County grand jury for the crime of sexual battery, and the matter came for trial before a jury in October 1998. The trial ended in a hung jury, with eleven jurors voting for an acquittal and one juror voting for conviction. The Athens County prosecutor elected not to retry the case and all charges against plaintiff were dismissed with prejudice.
Local newspapers in Athens gave extensive coverage to plaintiff's criminal trial, as well as the prosecutor's decision not to retry the case. In addition to reporting the facts of the trial, the newspapers published editorials, press releases and letters expressing various opinions about the case. Among the published materials, plaintiff's parents wrote a letter characterizing the actions taken by defendant in plaintiff's case as "appalling." The letter specifically criticized HEW for providing Delong with counseling and support, while denying such assistance to plaintiff. Jim Phillips, an associate editor for The Athens News, contacted Woodruff and asked her to respond to the letter written by plaintiff's parents. Woodruff orally answered several of Phillips' questions, and she later provided a written statement in response to the parents' letter.
On November 12, 1998, The Athens News published a newspaper article entitled: "After sexual battery charges are dismissed Mallory's parents lash out at OU, media." The article included quoted statements made by plaintiff's parents, plaintiff's defense attorney (Robert Toy), prosecuting attorneys, a member of a lesbian/feminist student group, and defendant's employees, including Woodruff.
The section of the article containing Woodruff's comments stated as follows:
 Among those criticized by Toy and Mallory's parents is OU's Department of Health, Education and Wellness, which provided the alleged victim with counseling and support following the sexual incident but which, according to Mallory's parents, "denied (Mallory) the support and assistance afforded other students who get into trouble even when he asked for it."
 Jeanine Woodruff, assistant director of the department, defended OU's actions in the Mallory case, arguing that Mallory is almost certainly guilty of sexual battery, whether or not a jury was willing to convict him of one.
 "The information generated by the (university) police definitely met the definition of sexual battery, and certainly was a violation of the student code of conduct," Woodruff said. "It's not like some people want to make out, that this was two drunk people having a good time, and one of them felt bad about it the next day For them to say (Mallory) was treated unfairly just seems kind of ridiculous, from my perspective. He definitely committed a sexual battery, from the information that was gathered."
 Woodruff said that while she and other officials are convinced Mallory committed the crime, "unfortunately, the criminal justice system does not always follow the definition of the law in its decisions as to innocence or guilt.["]
 "Instead," she added, "decisions are influenced by irrational and emotionally charged arguments made by highly paid defense attorneys whose job it is to represent this [sic] interests of their client. In my estimation, this is what happened in the Mallory trial."
In the present case, plaintiff bases his defamation claim on Woodruff's statement that, "[h]e [plaintiff] definitely committed a sexual battery, from the information that was gathered." As noted above, the trial court concluded that the statement was protected speech based on the court's finding that such statement constituted mere opinion.
In Lawson v. AK Steel Corp. (1997), 121 Ohio App.3d 251, 256, the court set forth the elements of a defamation action as follows:
 The essential elements of the common-law action of defamation, which includes both libel and slander, are:
 "'(a) a false and defamatory statement concerning another;
"'(b) an unprivileged publication to a third party;
 "'(c) fault amounting at least to negligence on the part of the publisher; and
 "'(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.'" Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc. (1992), 81 Ohio App.3d 591, 601 * * *, quoting 3 Restatement of the Law 2d, Torts (1977), 155, Section 558.
In general, "'[s]lander refers to spoken defamatory words, while libel is generally defined as written or printed defamatory words.'" Lawson, at 256. There are two actionable types of slander, slander per se and slander per quod. McCartney v. Oblates of St. Francis deSales (1992),80 Ohio App.3d 345, 353. Slander per quod has been defined as "slander determined by the interpretation of the listener, through innuendo, as between an innocent or harmless meaning and a defamatory one." Id. Slander per se, by contrast, "means that the slander is accomplished by the very words spoken." Id. Further, in order to be considered slander per se, a remark "must consist of words which import an indictable criminal offense involving moral turpitude or infamous punishment, imputes some loathsome or contagious disease which excludes one from society or tends to injure one in his trade or occupation." Id.
On the other hand, "expressions of opinion are `generally protected under Section 11, Article I of the Ohio Constitution.'" Condit v. Clermont Cty. Review (1996), 110 Ohio App.3d 755, 759. In order "[t]o determine whether a statement is fact or opinion, Ohio courts employ a `totality of the circumstances' test." Id. Under this test, courts consider "`the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared.'" Id. It has been noted that this is not a "bright-line" test, but, rather, a fluid standard in which the "facts of each case must be analyzed in the context of the general test." Id. Thus, "'[e]ach of the four factors should be addressed, but the weight given to any one will conceivably vary depending on the circumstances presented.'" Id.
In the instant case, the trial court considered the above four factors in finding that the alleged defamatory statement by Woodruff was opinion rather than fact. Regarding the specific language used, the court found that the statement was unambiguous and clearly ascertainable. The trial court noted that an allegation of a crime represents "a typical example of actionable language in a defamation claim." The trial court also noted, however, that there was specific language in Woodruff's statements suggesting that she was expressing an opinion. Specifically, the court noted that statements by Woodruff during the interview with the reporter included the qualifying phrases, "from my perspective," and, "in my estimation."
Regarding whether the comments were verifiable, the trial court held that, although Woodruff's claim that her assertion was based upon the information that was gathered "implies that she has proof to substantiate her allegations, the context of the statement suggests that it is a subjective, opinionated statement regarding plaintiff's criminal case." Finally, in considering both the general and broader context in which the statements appeared, the trial court found that the purpose of the article was to report differing reactions to the prosecutor's decision to dismiss criminal charges against plaintiff. The trial court noted that the article "clearly informs the reader that plaintiff's criminal case was tried before a jury and that he was not convicted," and the court concluded that, "[i]n this context, the impassioned statements made by community members concerning plaintiff's `guilt' or `innocence' are necessarily opinions and not facts."
In considering the specific language used by Woodruff, we agree with the trial court's determination that the statement, "[plaintiff] definitely committed a sexual battery, from the information that was gathered," is unambiguous. It has been noted that, "[a] classic example of a statement with a well-defined meaning is an accusation of crime." Ollman v. Evans (C.A.D.C. 1984), 750 F.2d 970, 980. In the present case, no reasonable person would have viewed the accusation of criminal conduct as "mere `rhetorical hyperbole' or as having been intended simply in a `loose, figurative sense.'" Owens v. CBS Inc. (1988),173 Ill. App.3d 977, 992.
Although the trial court found that Woodruff used phrases in the article suggesting she was expressing an opinion (i.e., "from my perspective" and "in my estimation"), we note that the alleged defamatory statement at issue was not prefaced with any qualifying language. Concerning the statements with qualifying language, in response to the parents' criticism of the university, Woodruff stated, "[f]or them to say (Mallory) was treated unfairly just seems kind of ridiculous, from my perspective." The final quote attributed to Woodruff in the article was her statement, "[i]n my estimation, this is what happened in the Mallory trial." This comment was made in reference to Woodruff's immediately preceding comment that, "decisions are influenced by irrational and emotionally charged arguments made by highly paid defense attorneys whose job it is to represent this [sic] interests of their client." As noted, however, Woodruff's statement that plaintiff "definitely committed a sexual battery" did not contain qualifying language, and the fact that she used qualifying language as to other statements appearing in the article is not, in our view, dispositive.
Further, even assuming that Woodruff had qualified the statement, "he definitely committed a sexual battery," with opinion language, the United States Supreme Court has noted that, simply couching such statements in terms of opinion does not dispel the implication of knowledge of facts which may be either incorrect or based on an erroneous assessment. Milkovich v. Lorain Journal Co. (1990), 110 S.Ct. 2695, 2706. Thus, "the statement, `In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, `Jones is a liar.'" Id. See, also, Rinaldi v. Holt, Rinehart Winston, Inc. (N.Y.App. 1977), 42 N.Y.2d 369, 382
("[a]ccusations of criminal activity, even in the form of opinion, are not constitutionally protected"). In Cianci v. New York Times Publishing Co. (C.A.2 1980), 639 F.2d 54, 64, the court observed:
 Almost any charge of crime, unless made by an observer and sometimes even by him * * *, is by necessity a statement of opinion. It would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, explicitly or implicitly, the words "I think".
As noted above, the trial court, in considering the verifiability of the statement, held that Woodruff's claim that her assertion was based upon "the information that was gathered" implied that she had "proof to substantiate her allegations." The trial court further held, however, that "the context of the statement suggests that it is a subjective, opinionated statement regarding plaintiff's criminal case."
The Ohio Supreme Court, in considering whether a statement is verifiable, has framed the issue in terms of the following inquiry: "Does the author imply that he has first-hand knowledge that substantiates the opinions he asserts?" Vail v. The Plain Dealer Publishing Co. (1995),72 Ohio St.3d 279, 283. In instances where the author implies that he has such knowledge to support the opinion he expresses, "`the expression of opinion becomes as damaging as an assertion of fact.'" Scott v. News-Herald (1986), 25 Ohio St.3d 243, 251. In Condit, supra, at 760-761, the court discussed this factor, noting that the question whether a statement is verifiable:
 * * * [I]s a difficult one because most statements range over a continuum often containing discrete aspects which may be verified rather than "dividing neatly into categories of `verifiable' and `unverifiable.'" * * * When the "`statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content.'" * * *
* * *
 "A classic example of a statement with a well-defined meaning is an accusation of a crime" because such statements are "`laden with factual content' that may support an action for defamation." * * * By comparison, statements referring to appellant as someone who has been "shun[ned]," is a "fascist," "blame[s] the Jews," or "soil[s] what he touch[es]" are more akin to the phrases deemed nonactionable in Vail than they are to accusations of perjury or criminal misconduct, which are capable of proof or disproof in a court of law. Such words are too general to be verifiable and they do not imply undisclosed facts that would allow the statements to be verified. * * *
Here, the assertion by Woodruff that plaintiff committed a sexual battery is supported by a statement that is factual in nature, i.e., "from the information that was gathered," and implies "undisclosed facts that would allow the statements to be verified." Condit at 761. Stated otherwise, the implication is that Woodruff's assertion (plaintiff committed a sexual battery) is factually verifiable based on information generated by the university police. Thus, while we agree with the trial court that Woodruff's statement "implies that she has proof to substantiate her allegations," we disagree with the court's further conclusion that "the context of the statement suggests that it is a subjective, opinionated statement regarding plaintiff's criminal case."
In considering the immediate context of the statement, as indicated above, Woodruff's contention that plaintiff definitely committed a sexual battery, based on information gathered by the university police, suggests to the average reader or listener that the statement is based on fact rather than opinion, and implies that the university police had information sufficient to prove that a sexual battery occurred. The purported facts regarding this information, however, are not disclosed by Woodruff, and she acknowledged at trial that she had not reviewed any information gathered by the university police, nor did she possess any information other than that which was reported in the papers regarding the trial. The reader or listener, however, would be left with the impression that incriminating facts existed, generated by the university police investigation and known to Woodruff, which were sufficient to prove plaintiff's guilt, despite the fact plaintiff's guilt was not established by a conviction. Accordingly, the immediate context of the statement indicates that Woodruff intended to convey factual information.
The final factor involves the broader context in which the statement appears. In considering the "broader social context" in which a statement fits, it has been noted that "'[s]ome types of writing or speech by custom or convention signal to the readers or listeners what is being read or heard is likely to be opinion, not fact.'" Wampler v. Higgins (2001), 93 Ohio St.3d 111, 131, quoting Ollman, supra, at 983. A number of Ohio cases have dealt with this factor in the context of newspaper articles. In Vail, supra, at 280, a publication in a newspaper column appeared in a "Forum" section of the newspaper, bearing the name of the author and the caption "Commentary." The court in Vail considered the author's "reputation as an opinionated columnist" in finding that the statements at issue in that case were constitutionally protected. In Scott, supra, at 253, the article containing alleged defamatory statements appeared on the sports page, which the court noted was "a traditional haven for cajoling, invective, and hyperbole." In that case, the court concluded that, "[i]t is our belief that `legal conclusions' in such a context would probably be construed as the writer's opinion." Id. at 254. In Wampler, supra, the allegedly defamatory statements appeared in a letter to the editor. In that case, the court noted that "it is commonly known that the authors of letters to the editor are normally not engaged in the business of factual reporting or news dissemination, and that their letters qualify as what the Ollman court described as a `well established genre' of opinionated speech." Id. at 132.
In the present case, plaintiff argues that his action is one against defendant because of statements Woodruff made to the reporter, rather than an action against the newspaper for publishing the article containing the statement. Plaintiff maintains that the trial court appeared to analyze the case as a libel action, and therefore improperly analyzed the statements in the context of the news article. Although plaintiff emphasizes that his claim was for slander rather than libel, the trial court was still required to consider the statements at issue in a broader context and here, such analysis would properly include considering the nature of the circumstances giving rise to the article. Here, Woodruff made the comments based on questions by a reporter, in which she was asked to respond to comments made by plaintiff's parents.
In considering the statements in the context of its setting, as noted by the trial court, the article included reactions by community members regarding the prosecutor's decision not to retry plaintiff, as well as responses to statements made by plaintiff's parents. While we agree with the trial court's observation that community members made "impassioned statements" in the article regarding those issues, we do not find that the broader context necessarily supports the view that the statement at issue was opinion rather than fact. Here, Woodruff was interviewed in her capacity as an employee of defendant, and in particular, the assistant director of the department that provided counseling to the alleged victim following the sexual incident. Again, the statement at issue implied that her assertion had a factual basis, and the average reader or listener could have concluded that Woodruff was in a position to have been privy to the information gathered by the university police, thereby viewing her statement as fact rather than opinion.
Upon consideration of the above factors, we find that the trial court erred in finding that the statement at issue was mere opinion and therefore constituted protected speech. Rather, we conclude that the statement involves a direct accusation of criminal activity involving moral turpitude on the part of the plaintiff, and we therefore conclude, as a matter of law, that the statement constituted slander per se.
Although we find that statement to be defamatory, we must still consider whether plaintiff's action must fail because of a qualified privilege. In Austin v. Peterson (Jan. 13, 1999), Medina App. No. 2735-M, unreported, the court discussed the purpose of a qualified privilege as follows:
 The purpose of a qualified privilege is to protect speakers in circumstances where there is a need for full and unrestricted communication concerning a matter in which the parties have an interest or duty. Hahn v. Kotten (1975), 43 Ohio St.2d 237, 246 * * *. A qualified privilege exists when a statement is: made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest. * * *
Further, "[t]he essential elements of a communication protected by qualified privilege are: '[1] good faith, [2] an interest to be upheld, [3] a statement limited in its scope to this purpose, [4] a proper occasion, and [5] publication made in a proper manner and to proper parties only.'" Austin, quoting Jacobs v. Frank (1991), 60 Ohio St.3d 111,114. Finally, "[i]f a defendant establishes all five elements for the application of a qualified privilege, a plaintiff can defeat its application only by showing by clear and convincing evidence that the defendant acted with actual malice." Austin, supra.
In the present case, plaintiff argues that Woodruff's statement was not entitled to a qualified privilege because it was not limited in its scope to the interest to be upheld. We agree. Here, Woodruff gave statements to a reporter in response to remarks made by plaintiff's parents regarding the university's handling of the situation, including the allegation that HEW provided Delong with counseling and support while denying assistance to plaintiff. To the extent that Woodruff's statements were limited to addressing the parents' claim that their son was treated unfairly, the comments could be found to represent a reasonable response in defense of defendant and Woodruff's department. However, Woodruff's statement that plaintiff "definitely committed a sexual battery" was unnecessary to the protection of defendant's interests and exceeded the scope of the interest to be upheld. Rather, Woodruff could have explained her position and that of defendant "without slandering plaintiff." Waterman v. Martin (Apr. 16, 1981), Franklin App. No. 80AP-627, unreported (purpose of defendant-shareholder's statement was to explain why defendant supported management in proxy contest prior to plaintiff's election at shareholder's meeting; defendant's statement that plaintiff had proposed a stock manipulation scheme prior to his election went beyond any proper purpose to inform shareholders why defendant supported management, and therefore statement was not protected by doctrine of qualified privilege).
Accordingly, we sustain plaintiff's single assignment of error and find that plaintiff is entitled to judgment, as a matter of law, on the issue of liability, and we remand this matter to the trial court for a trial on the issue of damages.
Based upon the foregoing, plaintiff's assignment of error is sustained, the judgment of the trial court is reversed and this matter is remanded to the Ohio Court of Claims for further proceedings in accordance with law and consistent with this decision.
Judgment reversed, and cause remanded.
BROWN and KENNEDY, JJ., concur.