[Cite as *Savage v. Ohio State Univ.*, 2013-Ohio-4856.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

SCOTT A. SAVAGE

    Plaintiff

    v.

OHIO STATE UNIVERSITY

    Defendant

Case No. 2009-06575

Magistrate Holly True Shaver

DECISION OF THE MAGISTRATE

{¶ 1} On June 14, 2010, after an evidentiary hearing, the court found that Norman Jones, Hannibal Hamlin, and Gary Kennedy were entitled to civil immunity pursuant to R.C. 9.86 and 2743.02(F). On August 11, 2010, the court dismissed plaintiff's constitutional claims. On March 2, 2011, the court issued a decision on defendant's motion for summary judgment, wherein it stated that "there are genuine issues of material fact as to the claim of defamation associated with the April 17, 2006 faculty meeting and as to plaintiff's claim for intentional infliction of emotional distress. Defendant's motion for summary judgment shall be granted and judgment shall be rendered in favor of defendant as to all claims for defamation listed in the complaint with the exception of the comments allegedly made by Hamlin during the April 17, 2006 faculty meeting." On February 25, 2013, the court conducted a trial on the remaining claims.

{¶ 2} As stated in the court's June 14, 2010 and March 2, 2011, decisions, the following facts have been established: "plaintiff is a devout Christian and a member of a conservative organization known as the Religious Society of Friends. From August 2004 until July 2006, plaintiff held the position of head of reference and library

instruction at the Broomfield Library on defendant's Ohio State University-Mansfield (OSU-M) campus. In February 2006, plaintiff became a member of OSU-M's First Year Reading Experience Committee (the committee) along with faculty members Norman Jones, James Buckley,[1] Hannibal Hamlin, and Gary Kennedy. The committee's task was to suggest titles of books to be included on the required reading list for incoming freshman students. The committee communicated their recommendations via e-mail. Plaintiff asserts that in response to an e-mail citing what he viewed as rather liberal texts, he commented that the books should not be polarizing and he also offered a few more conservative titles.

{¶ 3} "In response to plaintiff's e-mail, Hamlin and Jones sent e-mails to the committee criticizing both plaintiff's statements and his selections while defending their position that incoming freshman should be presented with texts that challenge their beliefs and generate discussion. In an e-mail to the committee dated March 9, 2006, Jones referred to one of the books on plaintiff's list as 'not scholarly' and 'designed to be incendiary.' Plaintiff's selection of the book, entitled *The Marketing of Evil,* and plaintiff's staunch defense of his selection quickly became the source of contention between plaintiff and the other faculty members. Jones expressed his concerns that the book offered anti-gay sentiments which did not comport with the university's policy of tolerance for those persons who identified themselves as gay, bisexual, lesbian, or transgender.

{¶ 4} "In support of his position, plaintiff referenced positive book reviews that had been posted on a well-known internet website identified as 'Amazon.com.' In one e-mail response, plaintiff added that the book had been endorsed by a 'Ph.D. with more scholarly heft than most anyone I know at [OSU-M].' (Defendant's Exhibit G.) Jones, and other faculty took offense at this comment and went on to distinguish their own credentials from those of the person who endorsed the book. Jones also notified

---

[1]Mr. Buckley has since died.

plaintiff's supervisor that plaintiff's continued advocacy for such book was inappropriate and caused him to question plaintiff's competence and professionalism as a reference librarian. According to plaintiff, it was his intention merely to oppose what he perceived to be the totalitarian behavior expressed by the faculty of OSU-M.

{¶ 5} "Plaintiff testified that the e-mails initially were confined to members of the committee, then later circulated to all students, faculty, and staff on campus. Eventually, the e-mails were sent to mailbox addresses that were off-campus. Plaintiff stated he was not sure who was responsible for doing that. As the controversy continued to escalate, plaintiff believed that his right to speak freely was in danger of being suppressed and that, therefore, he forwarded the e-mail chain to a member of the Foundation for Individual Rights in Education (FIRE). Once this group became involved, the controversy at OSU-M received widespread attention nationally and there were numerous internet postings and e-mail exchanges.

{¶ 6} "On March 12, 2006, Jones sent an e-mail to all faculty members accusing plaintiff of 'harassment' and of 'creating a hostile work environment.' (Defendant's Exhibit L.) At a March 13, 2006 faculty meeting, Hamlin accused plaintiff of engaging in sexual harassment and of defending hate literature. On March 16, 2006, Kennedy filed a discrimination/harassment complaint against plaintiff with OSU-M's Human Resources officer and general counsel. (Defendant's Exhibit P.) On March 20, 2006, Hamlin filed a similar complaint alleging that plaintiff engaged in inappropriate behavior that may constitute harassment. (Defendant's Exhibit Q.) In his complaint, Hamlin noted that while plaintiff and Jones had met and resolved their differences, Hamlin remained dissatisfied with the university's handling of the matter. Hamlin explained that 'no public apology or explanation has been forthcoming from Mr. Savage, nor has any statement condemning homophobia been made by the Dean that would clarify the situation, not only to [Jones and Buckley], but also to other (non-'out') gay and lesbian faculty and staff, as well as the rest of the faculty who feel as if the incident was essentially swept under the carpet. * * * An investigation into this matter might reassure them that the

University truly does stand, in no *uncertain* terms, behind the right of gay and lesbian employees to a safe and dignified working environment.'  (Defendant's Exhibit Q.)

{¶ 7} "Plaintiff received a letter from an OSU investigator on April18, 2006, informing him that he had been found not guilty of the charges filed with OSU-M's Human Resources office.

{¶ 8} "At the evidentiary hearing, Hamlin testified that, in his opinion, the situation with plaintiff brought to light a deeper problem that existed between the faculty and the administration at OSU-M.  Hamlin conveyed that he was not satisfied with the way the administration responded to what Hamlin deemed 'an atmosphere of fear and intimidation.' Hamlin also acknowledged that during a meeting he had with the dean, he expressed his opinion that plaintiff should be fired for his unprofessional conduct that 'poisoned the campus.'

{¶ 9} "In July 2006, plaintiff took a leave of absence from his position in response to what he characterized as extreme emotional distress that he had endured as a result of the defamatory statements of OSU-M's employees and the fallacious charge of sexual harassment filed against him."  (June 14, 2010 decision, p. 1-4.)

{¶ 10} As a result of the evidentiary hearing, the court determined that "Norman Jones, Hannibal Hamlin, and Gary Kennedy acted within the course and scope of their employment with defendant at all times and during all interactions regarding plaintiff that are at issue in this case.

{¶ 11} "Indeed, as both faculty and committee members, Jones, Kennedy, and Hamlin were expected to voice opinions about specific literature and to engage in discussions regarding the advisability of the members' recommendations.  Although the committee members' exchanges became rather heated and emotionally charged, the discussions took place within the context of their university employment.   The subsequent proceedings regarding sexual harassment were similarly related to Jones, Kennedy, and Hamlin's university employment.

{¶ 12} "In addition, the court finds that plaintiff failed to prove, by a preponderance of the evidence, that the above-listed individuals acted with malicious purpose, in bad faith, or in a wanton or reckless manner toward plaintiff. Although the charges of sexual harassment were ultimately determined to be without merit, the evidence does not support the conclusion that charges were made for an improper purpose." (June 14, 2010 decision, p. 5-6.)

{¶ 13} Initially, the court notes that at the February 25, 2013 trial, plaintiff and Hamlin both testified, and the depositions of Dean Evelyn Freeman and Elizabeth Burns, plaintiff's former supervisor at the library, were submitted, along with some additional exhibits and the exhibits that had been submitted previously. Upon review of the testimony and evidence presented, the court makes the following determination.

## I. DEFAMATION

{¶ 14} The sole remaining claim of defamation is based upon a statement made by Hamlin at a faculty meeting on April 17, 2006, wherein Hamlin accused plaintiff of unprofessional behavior and of taking actions that were "unethical and against the university." The court has already determined that inasmuch as plaintiff admitted to Norman Jones that he acted unprofessionally, plaintiff's claim of defamation as to that statement fails as a matter of law. (*See* March 2, 2011 decision, p. 7, referring to Defendant's Exhibits DD, MM.)

{¶ 15} Plaintiff's Exhibit 7 was offered as purported meeting minutes from the April 17, 2006 Faculty Assembly. Even though defendant disputes the authenticity of the minutes because they do not indicate that they were ever approved, Hamlin testified that the minutes accurately reflect the statements that he made at the meeting. Therefore, the court will rely on the statements attributed to Hamlin in Plaintiff's Exhibit 7 to analyze the defamation claim.

{¶ 16} Dean Freeman called the April 17, 2006 Faculty Assembly to issue a chronology of events that had occurred beginning on April 13, 2006, when The Alliance

Defense Fund issued a press release to news media throughout the United States. The press release resulted in a story that appeared in a publication known as "Inside Higher Education," where it was reported that a complaint had been filed against the OSU-M reference librarian for sexual harassment based upon his suggestion of a book to be read in a freshman reading group. After Dean Freeman informed the faculty that the university planned to bring in a mediator to address the issues that had arisen between the faculty and the library staff, Hamlin made the following comments:

{¶ 17} "It seems to be that a lot of the language that we are hearing that is expressing the way the university is dealing with this situation suggests that this is a conflict between faculty and library. It seems to be that what has happened is the result of a single staff member taking actions that are unethical and against [the] university. I am uncomfortable that we have to meet at a table as though we are equal parties, implying that we have somehow attacked this staff member, which is certainly not the situation." (Plaintiff's Exhibit 7, p. 4.) Hamlin later stated: "One serious concern I have is in response to the kinds of things that Mark [Ellis] was saying, this is a scary situation, but I would be very disturbed if as a result of this we backed off on university policy on sexual harassment. I am disturbed that free speech allows a violation of * * * ." (*Id.*, p. 6). Hamlin's last comment at the meeting was: "One of the things that concerns me is a broader confidence in the university. I have a troubled confidence over whether the university is going to act in our interests. I'm nervous that our concerns about the library will not be met. I'm not sure I'm confident in what our publicity office will say. I am simply expressing my concern." (*Id.*, p. 7.)

{¶ 18} Hamlin testified that he felt it was unethical to surreptitiously copy university emails to FIRE without notifying the participants. Hamlin testified that he felt plaintiff had acted against the university when he involved the Alliance Defense Fund in the matter, in that the Alliance Defense Fund issued a cease and desist order against OSU-M and threatened litigation. In addition, the Alliance Defense Fund was

responsible for publishing online the discrimination complaints, which the university considered confidential, during a pending investigation.

{¶ 19} Defamation is the publication of a false statement "made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *A & B-Abel Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7, 1995-Ohio-66. Under Ohio common law, actionable defamation falls into one of two categories: defamation per se or defamation per quod. In order to be actionable per se, the allegedly defamatory statement must fit within one of four classes: (1) the words import a charge of an indictable offense involving moral turpitude or infamous punishment; (2) the words impute some offensive or contagious disease calculated to deprive a person of society; (3) the words tend to injure a person in his trade or occupation; or (4) the words tend to subject a person to public hatred, ridicule, or contempt." *Am. Chem. Soc. v. Leadscope, Inc.*, 10th Dist. No. 08AP-1026, 2010-Ohio- 2725, ¶ 49, citing *Schoedler v. Motometer Gauge & Equip. Corp.*, 134 Ohio St. 78, 84 (1938). Defamation per se occurs if a statement, on its face, is defamatory. *Id.*

{¶ 20} "When a statement is defamatory per se, a plaintiff may maintain an action for defamation and recover damages, without pleading or proving special damages. In other words, in cases of defamation per se, the law presumes the existence of damages. When, however, a statement is only defamatory per quod, a plaintiff must plead and prove special damages." (Internal citations omitted.) *Id.* at ¶ 51.

{¶ 21} With regard to Hamlin's statement that a "staff member [took] actions that are unethical and against the university," plaintiff asserts that those words constitute defamation per se because they tend to injure him in his trade or occupation. However, under the Ohio Constitution there is a "separate and independent guarantee of protection" for statements that constitute opinion. *Wampler v. Higgins,* 93 Ohio St. 3d 111,119, 2001-Ohio-1293, citing *Vail v. Plain Dealer Publishing* Co., 72 Ohio St. 3d 279,

1995-Ohio-187. Therefore, if the statements Hamlin made were statements of opinion, plaintiff's claim of defamation fails as a matter of law.

{¶ 22} "To determine whether a statement is fact or opinion, Ohio courts employ a 'totality of the circumstances' test. Under this test, courts consider 'the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared. It has been noted that this is not a 'bright-line' test, but, rather, a fluid standard in which the 'facts of each case must be analyzed in the context of the general test. Thus, 'each of the four factors should be addressed, but the weight given to any one will conceivably vary depending on the circumstances presented.'" *Mallory v. Ohio University*, 10th Dist. No. 01AP-278, 2001-Ohio-8762, quoting *Condit v. Clermont Cty. Review,* 110 Ohio App.3d 755, 759 (12th Dist.1996).

{¶ 23} Regarding the specific language used, the court must determine whether the average listener would view Hamlin's statement to be factual, where its meaning is readily ascertainable, or opinion, where its meaning is ambiguous. *Vail, supra* at 282. Hamlin stated that plaintiff took actions that were unethical and against the university. The court finds that the terms "unethical" and "against the university" would mean different things to different people, making their meaning not readily ascertainable. An ordinary person would view those assertions as an opinion that Hamlin held with regard to the events that had transpired during the controversy at OSU-M.

{¶ 24} Next, the court must consider whether Hamlin's statements are verifiable. Generally, statements that imply the author "has firsthand knowledge that substantiates the opinions he asserts" suggest that the statement has specific factual content. *Id.*, at 283. In this case, Hamlin further stated that he was "uncomfortable that we have to meet at a table as though we are equal parties, implying that we have somehow attacked this staff member, which is certainly not the situation." (Plaintiff's Exhibit 7, p. 4.) The court finds that Hamlin implied that he had firsthand knowledge that

substantiates his statements when he added "which is certainly not the situation." However, "when the 'statement lacks a plausible method of verification, a reasonable [listener] will not believe that the statement has specific factual content." *Vail, supra*, at 283. The court finds that whether plaintiff was unethical or acted against the university lacks a plausible method of verification because both statements are too general in nature to be verified.

{¶ 25} In analyzing both the general and broader context in which Hamlin's statements were made, the court finds that the purpose of the faculty assembly was for Dean Freeman to advise the faculty that OSU-M had become the subject of national media attention. The court notes that the harassment complaints were still under investigation at the time of the Faculty Assembly. After Dean Freeman gave her preliminary remarks, she specifically opened the meeting to questions from the faculty. Dean Freeman wanted to ensure that the work environment was "safe and welcoming to everyone." (Plaintiff's Exhibit 7, p. 3.) In this context, Hamlin's statements characterizing plaintiff's actions as unethical and against the university are necessarily his opinions about the origins of the controversy.

{¶ 26} Based upon the totality of the circumstances, the court concludes that the ordinary listener would view Hamlin's statements as opinion and not as fact. Consequently, the court finds that plaintiff has failed to prove his claim of defamation.

{¶ 27} Assuming, arguendo, that Hamlin's statements could be construed as factual, the court further finds that Hamlin's statements are subject to a qualified privilege.

{¶ 28} "The purpose of a qualified privilege is to protect speakers in circumstances where there is a need for full and unrestricted communication concerning a matter in which the parties have an interest or duty. * * * A qualified privilege exists when a statement is: made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a

manner and under circumstances fairly warranted by the occasion and duty, right or interest.  The essential elements of a communication protected by qualified privilege are: good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication made in a proper manner and to proper parties only. Finally, if all five elements are established, a plaintiff can defeat its application only by showing by clear and convincing evidence that the defendant acted with actual malice." (Internal citations omitted.)  *Mallory, supra*, at  21-22.

{¶ 29} Upon review of the evidence, the court finds that Hamlin acted in good faith when he made his statements at the faculty assembly.  Hamlin's interest to be upheld was the fact that he was a faculty member at OSU-M whose colleagues specifically expressed to him that they felt threatened and harassed by plaintiff's actions.  Hamlin's statements were limited in their scope and purpose because he made them at a faculty assembly that was convened as a result of national media attention that plaintiff had initiated by contacting the Alliance Defense Fund.  The proper occasion was the faculty assembly to address the controversy.  Hamlin's statements were made in a proper manner and to proper parties only: at a faculty assembly where faculty members were encouraged to vent their concerns regarding the national media coverage.  The court finds that Hamlin's statements were communicated in the employment setting concerning matters of common interest to OSU-M.  Therefore, the court finds that Hamlin's statements were subject to a qualified privilege.  As such, plaintiff has the burden of establishing that Hamlin acted with actual malice.  *Evely v. Carlon Co.*, 4 Ohio St.3d 163, 165-166 (1983).  "In a qualified privilege case, 'actual malice' is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity."  *Jacobs v. Frank*, 60 Ohio St.3d 111, 116 (1991).

{¶ 30} Based upon the evidence presented, the court finds that plaintiff has failed to prove that Hamlin acted with actual malice when he made his statements at the April

17, 2006 faculty meeting.   The court finds that Hamlin believed that his statements were, in fact, true.   The evidence shows that on March 9, 2006, at 11:22 a.m., plaintiff wrote a response to the email from Jones, who had characterized *The Marketing of Evil* as "anti-gay" and "homophobic tripe."   Plaintiff's response, which was sent to multiple faculty and staff, was also sent to Greg Lukianoff at FIRE.   In the response, plaintiff defends his book selection, and states: "And for balance, here's an endorsement from a Ph.D. with more scholarly heft than most anyone I know at [OSU-M]."   (Plaintiff's Exhibit 8, p. 5.)   After a series of responses from multiple OSU-M employees who reacted to the exchange between Jones and plaintiff, plaintiff, at 2:40 p.m. wrote: "Everyone: Please take greg.lukianoff@thefire.org off your Cc list.  I copied Greg at The Foundation For Individual Rights in Education my reply to Norman's first post directed at me, and the cc has continued with all ensuing comments.  To save his time, please remove him from the list, and I will update him as he requests, as well as the ALA IF office." (Plaintiff's Exhibit 8, p. 11.)   The evidence shows that plaintiff added Lukianoff to a group of university employee emails without notifying the university employees until later in the day.  At that point, multiple faculty and staff had aired their opinions on the matter by responding to the email without knowing that Lukianoff was also receiving their responses.   Whether doing so was "unethical" or "against the university" is debatable, however, plaintiff has failed to prove by a preponderance of the evidence that Hamlin's statements were made with reckless disregard as to their truth or falsity. Therefore, the court finds that plaintiff has failed to prove his claim of defamation by a preponderance of the evidence.

## II.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

{¶ 31} Under Ohio law, a plaintiff claiming the tort of intentional infliction of emotional distress must show: "(1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and

outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it." *Burkes v. Stidham*, 107 Ohio App.3d 363, 375 (8th Dist.1995).

{¶ 32} "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. * * * The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 374-5 (1983)*.*

{¶ 33} The Tenth District Court of Appeals has also addressed this issue and held that "major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough. Only conduct that is truly outrageous, intolerable and beyond the bounds of decency is actionable; persons are expected to be hardened to a considerable degree of inconsiderate, annoying and insulting behavior. Insults, foul language, hostile tempers, and even threats must sometimes be tolerated in our rough and tumble society." *Strausbaugh v. Ohio Dept. of Transp.*, 150 Ohio App.3d 438,444, 2002-Ohio-6627, ¶ 15.

{¶ 34} Plaintiff asserts that the faculty's conduct, including that of Jones, Hamlin, and Kennedy throughout the entirety of the controversy, beginning in March 2006, forms the basis of his claim of intentional infliction of emotional distress. Plaintiff maintains that Hamlin and other faculty members continued to circulate communications that associated his name with phrases such as "sexual harassment," and "hate," for the sole

purpose of causing him to be fired, even after the investigation of the harassment claims was resolved in his favor.

{¶ 35} To support his claim, plaintiff testified that after the initial email exchanges in March 2006, he met with Jones and he and Jones apologized to one another. Plaintiff thought at that time the controversy was over. Then plaintiff learned that two different claims of harassment had been filed against him. Plaintiff testified that, as a conservative Christian, he was ashamed to tell his wife that he had been accused of sexual harassment. Plaintiff testified that he thought he would lose his job and also felt intense shame about the allegation. Plaintiff left OSU-M in July 2006 because the atmosphere was very negative. According to plaintiff, it was specifically stressful to him because faculty members were not bringing their classes into the library to work with him.

{¶ 36} Plaintiff took a six-month, unpaid leave of absence for personal reasons from July 2006 to January 2007. In a letter approving the leave request, Dean Freeman stated: "you indicated that your decision to seek leave was due in part to recent events occurring on our campus. With respect to this reason, as we have during the past few months, we remain ready to provide assistance to you for any challenges that you might be confronting." (Plaintiff's Exhibit 37.) In November 2006, plaintiff sought an additional six months of unpaid leave for personal reasons, which was ultimately granted by Dean Freeman.

{¶ 37} When plaintiff filled out his application for leave, he was told that he could not write "work stress" as a reason unless he had a note from a psychiatrist. According to plaintiff, he could not go to a psychiatrist for religious reasons. Plaintiff stated that approximately two months after he began his leave, he spoke to a Christian counselor about his work stress. Plaintiff testified that he felt that there was no hope that the situation would work out and that he was constantly being criticized. Plaintiff felt angry and offended, and no longer liked the faculty. In June 2007, plaintiff notified Dean Freeman that he would not be returning to his position.

{¶ 38} Dean Freeman testified via deposition that after the human resources investigations were over, the faculty was not satisfied with her handling of the controversy. Hamlin met with her to express his own personal discontent, during which time Hamlin suggested to her that she terminate plaintiff's employment. However, Freeman testified that neither she nor the provost believed that plaintiff's employment should have been terminated. Freeman testified that her understanding of defendant's harassment policy was that if an individual feels that someone is being harassed, the individual should report it. Then the university is obligated to investigate it.

{¶ 39} Elizabeth Burns testified via deposition that she never heard or read anything that specifically stated that the faculty wanted plaintiff's employment to be terminated, however, she believed that the faculty would have preferred that he leave the university. Burns also stated that plaintiff was noticeably depressed before he left.

{¶ 40} Hamlin testified that he became involved in criticizing plaintiff's book suggestions after some of his openly gay colleagues took offense. Hamlin stated that at the faculty meetings in March 2006, faculty members were trying to decide whether they had a responsibility under university policy to report a case of suspected sexual harassment.[2] A number of faculty, including Hamlin, felt that the issue was not sexual harassment but discrimination or harassment on the basis of sexual orientation. Plaintiff's Exhibit 24 is a letter that Hamlin authored to report a suspected case of discrimination. Hamlin explained that the complaint was based on two principal focuses. First, plaintiff's persistence in defending his book choice, which had been pointed out to him by a gay faculty member as being both unscholarly and anti-gay.

---

[2]OSU-M's sexual harassment policy states, in part: "The university must investigate situations that come to its attention, even if the victim does not press charges. If you have any reason to suspect a violation may have occurred, you should bring it to the attention of your supervisor, or report it to the Dean/Director or to the Office of Human Resources Consulting Services." (Plaintiff's Exhibit 1.) Defendant's Non-Discrimination/Harassment Policy 1.10 states, in part: "Discrimination against any individual based upon protected status, which is defined as age, color, disability, gender identity or expression, national origin, race, religion, sex, sexual orientation, or veteran status, is prohibited." (Plaintiff's Exhibit 2.)

Second, plaintiff's surreptitious copying of the internal committee emails to the outside organization FIRE. In addition, Mr. Buckley had written that he felt personally harassed by plaintiff's actions. Hamlin felt compelled by his duty as a faculty member to file a complaint.

{¶ 41} After the harassment complaints were resolved, Hamlin met with Dean Freeman to express his feelings about the administration's handling of the matter. At some point in the meeting, Freeman asked what would resolve the issues between the faculty and the library and Hamlin stated something like, "well, we could fire him." Hamlin testified that his remark to Dean Freeman was simply "blowing off steam" and that his suggestion was not taken seriously.

{¶ 42} Upon review of the evidence presented, the court finds that plaintiff has failed to prove his claim of intentional infliction of emotional distress by a preponderance of the evidence. The court finds that none of the conduct of Hamlin, Jones, Kennedy, or Buckley was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community. The greater weight of the evidence shows that the faculty members who filed harassment charges against plaintiff were genuinely concerned that plaintiff had violated the university's non-discrimination/harassment policy. Moreover, Hamlin's statement to Dean Freeman that he thought that plaintiff should be fired does not rise to the level of extreme and outrageous conduct. Therefore, the court finds that plaintiff has failed to prove his claim of intentional infliction of emotional distress.

{¶ 43} Finally, even though plaintiff did not assert a claim for constructive discharge, the evidence does not support such a claim. The test for determining whether an employee was constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign. *Mauzy v. Kelly Services, Inc.*, 75 Ohio St.3d 578, 588-9, 1996-Ohio-265. In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable

person believe that termination was imminent. *Id.* The court finds that Dean Freeman's letters granting plaintiff's requests for two, six-month periods of unpaid leave, along with her statement of support in assisting him with any challenges, and her testimony that neither she nor the provost believed that plaintiff's employment should have been terminated as a result of the controversy, do not support a finding that a reasonable person would have believed that his termination was imminent. Therefore, any claim of constructive discharge, if pled, would also fail. For the foregoing reasons, the court finds that plaintiff has failed to prove any of his claims by a preponderance of the evidence and, accordingly, judgment is recommended in favor of defendant.

**{¶ 44}** *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
HOLLY TRUE SHAVER
Magistrate

cc:

Amy S. Brown                              Thomas W. Condit
Randall W. Knutti                         P.O. Box 12700
Assistant Attorneys General               Cincinnati, Ohio 45212
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

002
Filed June 25, 2013
To S.C. Reporter October 31, 2013