[Cite as *Saha v. Ohio State Univ.*, 2010-Ohio-5906.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

KUNAL SAHA

      Plaintiff

      v.

THE OHIO STATE UNIVERSITY

      Defendant
      Case No. 2007-02050

Judge Joseph T. Clark

DECISION

{¶ 1}  Plaintiff, Kunal Saha, brought this action against defendant, The Ohio State University (OSU), alleging the following causes of action:  Count One-breach of contract, Count Two-bad faith breach of contract, Count Three-bad faith tort, Count Four-national origin and race discrimination, Count Five-intentional infliction of emotional distress, Count Six-defamation, and Count Seven-unjust enrichment.[1] Plaintiff also requested that the court determine whether Drs. Phillip Johnson, Thomas Hansen, and David Fisher, are entitled to civil immunity pursuant to R.C.2743.02 and 9.86.  The issues of liability and damages were bifurcated and the case proceeded to trial on the issues of liability and civil immunity.  The court subsequently granted plaintiff's July 23, 2009 post-trial request for the court to determine whether Drs. Lauren Bakaletz, Christopher Walker, Grant Morrow, and John Barnard, are entitled to civil immunity as well.

---

[1]Plaintiff stipulated to the dismissal of Counts Nine and Ten on July 2, 2008, which the court approved on December 1, 2008.  In addition, the court granted partial summary judgment for defendant on December 23, 2008, as to Count Eight.

{¶ 2} Plaintiff alleges that defendant failed to follow the terms and conditions of its own bylaws during his tenure review process; that defendant did such in bad faith, with malice, and for an improper purpose; that the termination of his employment was based upon his race and national origin; that defendant engaged in extreme and outrageous conduct that caused him severe emotional distress; that defendant published false and defamatory statements about him that have damaged his reputation both personally and professionally; and finally, that defendant has unjustly benefitted both from the recognition that plaintiff brought to OSU through his research and from his acquisition of grant monies.

{¶ 3} Plaintiff testified that he obtained his medical degree in India in 1985. He pursued graduate studies at the University of Texas and, in 1993, he completed his Ph.D. in microbiology. From 1993 to 1998, plaintiff engaged in HIV/AIDS[2] research during his post-doctoral fellowship under the guidance of Dr. Volsky. Plaintiff recalled that he left Columbia in 1998 after he accepted an offer from OSU for a tenure-eligible faculty position. During that time period, plaintiff's wife traveled to India and according to plaintiff, she died there as the result of gross medical negligence.[3]

{¶ 4} Plaintiff began his employment with OSU in June 1998, as an Assistant Professor of Pediatrics in the Division of Molecular Medicine, Department of Pediatrics, College of Medicine. According to the offer of employment, the Department of Pediatrics (the department) is located at the Columbus Children's Hospital. It is undisputed that plaintiff was dually employed both by Children's Hospital as a member of the Children's Hospital Research Foundation (CHRF) and by OSU.[4] (Plaintiff's Exhibit 1.) OSU provided a portion of plaintiff's starting salary, approximately $25,000 per year, whereas CHRF paid plaintiff the remaining $50,000. Plaintiff received health benefits, life insurance, paid vacation days, and CHRF provided plaintiff with an office, furnishings, and a start-up package that paid the salaries and benefits for four support staff members.[5] (Plaintiff's Exhibit 1.)

---

[2]HIV-human immunodeficiency virus; AIDS-acquired immunodeficiency syndrome.

[3]According to plaintiff, India did not at that time recognize medical negligence as a separate civil action and that he took the unprecedented step of pursuing criminal prosecution of the physicians responsible for his wife's treatment.

[4]Various documents admitted as evidence at trial also refer to Children's Hospital Research Foundation as Children's Research Institute (CRI).

[5]Support was guaranteed for one year only; ongoing financial support would be reviewed annually and be conditioned upon "reasonable productivity and research progress." (Plaintiff's Exhibit 1.)

{¶ 5} The appointment was considered probationary; renewal of the appointment was conditioned upon the results of each annual review. (Plaintiff's Exhibit 9.) Plaintiff received a generally favorable review for calendar year 1999 which was documented in a letter to plaintiff dated December 1, 2000. The review was completed by David Fisher, M.D., Professor and Vice Chairman for Academic Affairs, Department of Pediatrics, and at the conclusion he stated "[p]lease note that you will be up for a fourth year academic performance review at OSU in academic year 2001/2002. * * * In the next year, I suggest that you maintain your teaching excellence, continue to publish your investigations, and submit for and obtain peer review funding." (Plaintiff's Exhibit 122.)

{¶ 6} Plaintiff received a similar review for calendar year 2000 after he met with Fisher on June 8, 2001. Again, Fisher included the following notation: "[i]n academic year 2000-2001, you will have completed your third year at the rank of Assistant Professor of Pediatrics on the regular tenure track. As we discussed, you will undergo a mandatory fourth year review in academic year 2001-02. * * * During the next year, I suggest that you continue to work on documenting your teaching quality excellence, maintain your track record of outstanding high quality publications, and apply for additional external national peer review funding." (Plaintiff's Exhibit 122.)

{¶ 7} Plaintiff testified that in the fall of 2001, he was invited to lecture at an AIDS conference in India. Plaintiff accepted the invitation and scheduled his trip for mid-December through mid-January. Plaintiff testified that while he was in India, his lawyers petitioned the Supreme Court of India to allow plaintiff's case against his wife's doctors to proceed to trial. According to plaintiff, the court agreed, on the condition that plaintiff remain in India and attend the trial. Plaintiff related that he remained in India throughout January and February 2002 and stated that he kept in contact with his laboratory technicians and his post-doctoral students by e-mail and by telephone. In early March 2002, plaintiff received an e-mail from the department's chief administrator, Mitchell Wheeler, stating that plaintiff had exhausted all of his accumulated vacation time from both CRI and OSU, such that he was in danger of being dropped from both payrolls. (Plaintiff's Exhibit 48.) Wheeler notified plaintiff that he could request a leave of absence from OSU and that such request would have to be addressed to Dr. Hansen, Chairman, Department of Pediatrics (Hansen). Plaintiff responded on March 9,

2002, and asked for an approved leave of absence.  In his e-mail, plaintiff stated as follows:

{¶ 8}  "This is an urgent request to please allow me 'personal leave' considering the unfortunate and unavoidable circumstances that compelled me to stay away from my office for extended period of time.  * * * I have been fighting an uphill battle in India from the USA to bring justice to [my wife's] unfathomable death.  Due to the sinister system and a total lack of responsibility in the medical profession, I've been fighting this seemingly impossible battle for the past almost 4 years.  In my search for justice I had to take several short trips to India in the past years to continue the legal battle.

{¶ 9}  "When I came to India in December, 2001 to attend an International AIDS conference, I had absolutely no idea that I may have to stay here for [an] extended period of time.  However, during a hearing of this case at the Supreme Court of India in early January, an unprecedented order was passed by the Supreme Court to complete this long legal proceeding on a 'day to day' basis.  The Supreme Court passed this historical order for an expeditious justice, considering my physical presence in India.  As such, I had no option but to attend the hearings as I felt it was the best way to end this long fight from so far away.  * * *  Unfortunately, the unpredictable course of this legal battle has taken it much longer than what I expected and has now continued for almost two months.

{¶ 10} "Due to this totally unforeseen and unexpected circumstance as described above, I'm still stuck in India with the hearings in this case [almost over.]  * * *  Even during my physical absence in the USA, I've been keeping close connection with my lab and the work in the lab has been progressing more or less as planned before.  I'm confident that I will be able to make up the lost period of time once I get back to Columbus.  According to my attorneys in India, the case should be over in a couple of weeks time but it is extremely important that I stay physically present here during that time."[6]  (Plaintiff's Exhibit 48.)

{¶ 11} Plaintiff's request was approved by the OSU Board of Trustees at their April 5, 2002 meeting.  Specifically, the board granted plaintiff a leave of absence without pay effective February 22, 2002 through August 31, 2002.  (Plaintiff's Exhibit 117.)  Plaintiff testified that he returned to Columbus at the end of April 2002.  In an e-

---

[6]Plaintiff testified that the trial resulted in two physicians being convicted and sentenced to prison.

mail to Wheeler dated April 30, 2002, plaintiff wrote: "I've returned from my trip to India and joined my lab yesterday. I'm still confused as to the status of my application for 'personal leave' that I sent from India. I'm aware that my payroll has been stopped from sometime in March." (Plaintiff's Exhibit 22.)[7]

{¶ 12} According to plaintiff, the next day Dr. Phillip Johnson, Vice Chairman of the Department of Pediatrics, accused plaintiff of abandoning his job and informed plaintiff that his technicians and post-doctoral students had been reassigned or were no longer employed at CRI. On May 1, 2002, Dr. Johnson sent plaintiff a memorandum which stated as follows:

{¶ 13} "Your CRI internal support package will end June 30, 2002.

{¶ 14} "Your personal salary support from CRI will end August 31, 2002.

{¶ 15} " * * *

{¶ 16} "You may continue to expend external grant funds.

{¶ 17} "* * *

{¶ 18} "You should meet with Mr. Mann (Vice President, CRI) to discuss budgeting and personnel issues." (Plaintiff's Exhibits 54, 89.)

{¶ 19} According to plaintiff, no other researcher ever had their internal support withdrawn at OSU or at CRI. Plaintiff sought to have his internal support reinstated; but was unsuccessful. (Plaintiff's Exhibit 56.) Plaintiff met with Hansen in August 2002, in an effort to pursue a faculty grievance against Johnson for the unilateral actions taken at CRI. Hansen declined to act on plaintiff's complaint and explained that the internal support was an element of plaintiff's employment package with CRI, rather than a benefit conferred as a result of his faculty appointment at OSU. (Plaintiff's Exhibits 90, 91.)

{¶ 20} Concomitant with the time period that plaintiff remained in India, the department was preparing for plaintiff's fourth-year review. As such, plaintiff was required to assemble and submit his dossier. Plaintiff was faced with the logistical difficulties of compiling the necessary documents in absentia, and he failed to submit his dossier by the deadline. In an e-mail to plaintiff on March 4, 2002, Fisher wrote as follows:

---

[7] In an e-mail prepared by Daniel Mann, Vice President of CRI, it is stated that plaintiff had exhausted all of his paid leave by March 3, 2002, and that effective March 4, 2002 through April 28, 2002,

{¶ 21} "You and I have discussed the OSU process for [promotion and tenure] annually for several years at your annual academic review. Tina Ratliff has communicated what you need to do for several months. We have never had anyone in our department miss a deadline for dossier submission. Your dossier was due at the College of Medicine for review there on March 1, 2002. Prior to being sent there it needs to be reviewed by the faculty (associate professors and professors) first and then the department chair. Each step needs to generate a letter of evaluation and recommendation to the next step. This generally takes 2-3 weeks. It is your responsibility to complete the dossier. Please work quickly with Amy to complete the dossier. We will do the best we can to perform the department review quickly when you give us the dossier, but I cannot promise you exactly how OSU will treat your tardiness and lack of attention to date." (Defendant's Exhibit E.) On August 9, 2002, plaintiff met with Fisher for the annual review of calendar year 2001. Fisher noted that "[i]n academic year 2001-2002, you completed your 4th year at the rank of assistant professor of pediatrics on the regular tenure track. You were scheduled for your 4th year review during the academic year 2001/02. Unfortunately, you were out of the country for several months. Although I informed you well in advance and also by email during your absence that your dossier was required for this review, you submitted it many months after the expected date and not until early in academic year 2002/03. You are also aware that there was some concern that you were not available to mentor your graduate students. * * * Please note that you have not yet been evaluated for reappointment. This will be decided based on the 4th year review that is currently in progress." (Plaintiff's Exhibit 132, Page 6 of 50.)

{¶ 22} The Committee of Eligible Voting Faculty (CEVF) in the department of pediatrics reviewed plaintiff's dossier on August 29, 2002. Two members voted for reappointment, and eleven voted against plaintiff's retention on the faculty tenure track. According to the letter sent to Hansen by Dr. Grant Morrow, a professor in the department of pediatrics and the committee's representative, the CEVF expressed concerns that the quality of the mentoring and supervision by plaintiff over his students and post-doctoral trainees was inadequate during his extended and unplanned leave of absence. (Plaintiff's Exhibit 93.) On September 25, 2002, Hansen authored a

_____

he was considered absent without pay and did not receive any salary. Plaintiff's salary from Children's

letter to Dean Sanfilippo at the College of Medicine wherein he stated that "[a]fter reviewing the letter from Dr. Grant Morrow summarizing Dr. Saha's performance and Dr. Saha's packet, I support the committee's recommendation and do not recommend Dr. Kunal Saha for reappointment on the regular tenure track after his four-year mandatory review." (Defendant's Exhibit G.) Hansen noted that plaintiff's prolonged absence had not been prospectively approved by the department and that plaintiff had not maintained effective communication with his students who were working in his laboratory. Hansen concluded that plaintiff's "overall academic productivity has been marginal and his lack of oversight of his laboratory has been of great concern." (Defendant's Exhibit G.)

{¶ 23} Plaintiff responded to the recommendations above with a rather lengthy letter to the dean wherein he characterized the decision of the CEVF members as "discriminatory, biased, and done with an ulterior motive." (Defendant's Exhibit I.) According to plaintiff, the actions by Johnson were precipitous and without prior warning, and he theorized that his negative review stemmed from his confrontation with Johnson. (Defendant's Exhibit I.) In addition, plaintiff insisted that he was in regular contact with his students and that their education and training did not suffer while he was absent. Plaintiff also complained that he was unfairly evaluated in that the committee members focused on criteria other than plaintiff's research efforts, in direct contrast to the approved Appointments, Promotion and Tenure (P&T) guidelines. According to plaintiff, the CEVF members unfairly discounted the quality and number of his publications, the importance of his national and international speaking engagements, and plaintiff's "remarkable discovery" of a strain of HIV that attacked the body in a previously undiscovered way, via CD8+ cells rather than the known receptor for HIV, CD4 cells. (Defendant's Exhibit I.)

{¶ 24} On December 13, 2002, Fisher responded to plaintiff's allegations in a letter to the dean. Fisher stated that the faculty and the chairman of the department recommended against plaintiff's reappointment for two reasons: 1) his prolonged and unanticipated absence from his laboratory; and 2) "his marginal research productivity in the form of few peer-reviewed manuscripts originating from his laboratory effort while a faculty member at [OSU]. In the Department of Pediatrics, either result alone is

---

Hospital resumed upon his return to work date effective April 29, 2002. (Plaintiff's Exhibit 107.)

unacceptable for a probationary faculty member in the regular tenure track." (Defendant's Exhibit J.)  In addition, Fisher explained that the CEVF had assigned a committee member to interview plaintiff's students and that after speaking with several students, the faculty member surmised that the "supervision and mentoring were less than adequate."  (Defendant's Exhibit J.)[8]

{¶ 25} Dr. Bornstein, Senior Associate Dean for Academic Affairs, testified that he investigated plaintiff's allegations and that he concluded that there was insufficient documentation supplied by the department to establish that plaintiff did not adequately mentor his students and, on that basis, plaintiff was allowed to continue on the tenure track.  However, Bornstein commented that a negative fourth-year review can be fatal to one's future.  On April 24, 2003, Hansen notified plaintiff that "[b]ased upon additional information received in the form of letters from your former students" he had reconsidered his decision and that he now recommended that plaintiff continue on the regular tenure track.  In addition, Hansen advised plaintiff to begin preparing his dossier for the mandatory sixth-year review.  (Defendant's Exhibit K.)

{¶ 26} Plaintiff testified that in 2002 he had been forced to reduce his staff from five or six persons to two or three and that, as a result of the loss of his internal support, he was unable to continue with his research at the same level as before.

{¶ 27} Nonetheless, plaintiff accepted another invitation to deliver a lecture in India and he was absent from his laboratory during August and September 2003.  Prior to this departure, plaintiff had granted permission to Raquel Raices for her to spend a three-month rotation performing AIDS research in his laboratory, beginning August 1, 2003.  On September 9, 2003, Raices sent an e-mail to Dr. Christopher Walker, a professor at CRI whose research centered on Hepatitis C, asking if she could rotate to his lab because she had been unable to maintain contact with plaintiff while he was away and she was concerned about achieving her educational goals.  (Defendant's Exhibit M.)  Specifically, Raices stated as follows, "I picked Dr. Saha's lab since I was still very interested in working with HIV.  However, Dr. Saha has left to India since August 14th and I have had very little communication with him.  I think the emails somehow do not reach there or maybe he is having trouble sending emails to us. Whatever the case may be, I do not know when he is going to come back and I am

---

[8]At trial, Lauren Bakaletz, M.D. (Bakaletz), a professor in the department, was identified as the

extremely worried about my situation. I have sent him emails asking him when he will be back, but I do not get any response." (Plaintiff's Exhibit 35.)

{¶ 28} Walker testified that he had a supervisory role over plaintiff and that he served as a conduit between Johnson and plaintiff. Due to the department's previous concerns over plaintiff's prolonged absence from the department and the impact it had on plaintiff's ability to effectively supervise students, Walker forwarded the e-mail to Drs. Johnson, Fisher, and Hansen. Fisher sent the e-mail to Bornstein along with a comment that the e-mail was unsolicited, that it had been sent by a graduate student, and that such information was a concern to the department given plaintiff's "history." (Plaintiff's Exhibit 35.)

{¶ 29} On September 23, 2003, plaintiff received written notice of the results of his 2002 calendar-year review which had taken place in June 2003. Fisher noted that plaintiff had not published any peer-reviewed articles in 2002, that plaintiff had evidenced limited productivity over the previous 18 months, and that plaintiff needed to show improvement in his "publication and external national peer review funding record." (Defendant's Exhibit N.) Fisher also notified plaintiff that he would undergo a mandatory sixth-year review in academic year 2003-2004.

{¶ 30} OSU's tenure review process requires that the recommendation for or against tenure pass through three levels; department, college, and then university. Plaintiff submitted his dossier on October 14, 2003, and the CEVF met and reviewed the dossier on October 23, 2003. Eight members of the committee were present and they all voted against recommending that plaintiff receive tenure, no members voted in favor of plaintiff. The vote was communicated to Hansen in a letter dated the same day and authored by Morrow. The letter documented the committee's findings that plaintiff had taught only two classes (one in 1999 and again in 2000), that he had presented lectures at 17 conferences, that he had published only five peer-reviewed articles since arriving at OSU and that two of those appeared to reflect work done at a prior laboratory, that plaintiff had two patents pending approval and that, although he had received some grant funding (the most recent of which was set to expire in September 2004), his request for national funding had been denied and he was appealing that decision. Morrow also explained that, of the eight external review letters requested from

committee member who interviewed some of plaintiff's students.

his peers, four individuals declined to submit an evaluation, and one reviewer was quite critical of plaintiff's research into the role of CD8+ cells. (Defendant's Exhibit R.) Morrow concluded that the committee had concerns regarding plaintiff's "prolonged absences from Columbus; about his limited publication record and grant support since relocating to OSU; and the quality and quantity of his teaching." (Defendant's Exhibit R.) Morrow included a notation in reference to Raices that a "student recently moved to another laboratory because of Dr. Saha's lack of supervision." (Defendant's Exhibit R.)

{¶ 31} On December 8, 2003, Hansen sent a letter to Dean Sanfilippo stating that he concurred with the CEVF decision and he too recommended that plaintiff not be promoted to associate professor with tenure. (Defendant's Exhibit U.) Hansen cited plaintiff's prolonged absences in 2001-2002 and again in 2003 as "provoking considerable concern" within the department in regard to plaintiff's commitment to teaching. (Defendant's Exhibit U.) Hansen evaluated plaintiff's list of publications and determined that only two of the articles represented independent research based upon data which was solely produced during plaintiff's time at OSU. Hansen also criticized plaintiff's failure to secure significant external grant funding and commented that his external reviewers' statements, while positive overall, hinted that plaintiff's theories about the importance of CD8+ cells may be incorrect and that his theories had not yet achieved widespread acceptance in the field of HIV/AIDS research. (Defendant's Exhibit U.)

{¶ 32} On December 15, 2003, Hansen also sent plaintiff a letter notifying him that he had not met the department's criteria in teaching, research, scholarship, and service. According to Hansen, plaintiff had ten days to respond in writing before his dossier and the department's recommendation would be forwarded to the college for review. (Defendant's Exhibit V.)

{¶ 33} Plaintiff submitted a letter of rebuttal to the dean on December 26, 2003. Plaintiff again complained that the actions taken by the CEVF were "discriminatory, biased and done with an ulterior motive." Plaintiff pointed out that the recommendation against tenure from the department was nearly identical to the denial generated during the mandatory fourth-year review. In response to the issue of his prolonged absence in August and September 2003, plaintiff stated that he had visited New Delhi in order to develop "possible future collaboration in the area of AIDS research and I also presented a seminar there on August 18, 2003." (Defendant's Exhibit W.) Plaintiff recalled that he

then took some time off as vacation, for personal reasons, and that "[a]ll in all, I was in India for just about a month." Plaintiff then relates that "[a]lthough my initial plan to return to the US was in early September, 2003, I decided to extend my stay in India by a couple of weeks on personal grounds since I had already accumulated a lot of 'vacation' time." (Defendant's Exhibit W.) According to plaintiff, he maintained regular contact with his office and he directed his secretary to update the administration at CRI as to the extended stay and plaintiff's return to work the date of September 18, 2003.

{¶ 34} As to the issue with Ms. Raices, plaintiff insisted that she was scheduled to be in his lab for only one month, that she knew in advance that plaintiff would be in India during some of that time period, and that she received adequate exposure to HIV research from plaintiff and his other post-doctoral students.

{¶ 35} Next, plaintiff alleged that portions of the external reviewers' statements were taken out of context and that undue emphasis was placed on negative remarks while positive comments were discounted or overlooked. In addition, plaintiff complained that except for the names of two external evaluators that he supplied, Johnson "a person who bears utmost animosity against me" selected the remaining candidates. (Defendant's Exhibit W.) Plaintiff disputed the department's characterization of his research productivity and he attributed the lack of progress with his research in his laboratory to the loss of his internal support package. Plaintiff also claimed that while not yet approved, two of his pending grant applications were under review and he was confident that those monies would be awarded to him soon.

{¶ 36} Finally, plaintiff asserted that the vote taken by the CEVF consisted of only eight of the more than 70 eligible faculty members, that the vote took place prior to the date that plaintiff's "updated" dossier was completed, and that the voting members were not presented with a true and accurate assessment of the laboratory experiences provided to his students.

{¶ 37} Fisher responded to plaintiff's comments in a letter dated January 6, 2004. Fisher stated that he had spoken with Raices on September 22, 2003, and that she confirmed that, due in part to technical difficulties with e-mail communications, plaintiff was not available to her while he was in India. Raices advised Fisher that she was able to meet her educational goals after she transferred to another researcher's laboratory. According to Fisher, he explained the situation to the faculty as well as explaining to them the reasons why Hansen had reversed his decision regarding plaintiff's

reappointment after the fourth-year review. Fisher asserted that there was nothing unusual about scheduling the initial review of plaintiff's dossier for October 23, 2003, inasmuch as such review usually happened in September, and the review by the college was scheduled for November 1, 2003. Fisher noted that, after the committee deemed the dossier incomplete, plaintiff updated the dossier with impact factors[9] for the publications and additional external evaluation letters were received. (Defendant's Exhibit X.) According to Fisher, the vote was repeated on November 12 and 17, 2003; the results of the repeat votes were identical. Fisher concluded with this assessment: "Dr. Saha does not meet the research criteria for promotion or tenure. He has adequate quality of peer reviewed manuscripts and adequate national peer reviewed funding at PI level, but he has not published anywhere an adequate quantity of hypothesis driven, peer reviewed manuscripts. This alone is adequate justification for Dr. Hansen's recommendation not to recommend Dr. Saha for promotion or tenure. Faculty also had significant concern about his commitment to teaching." (Defendant's Exhibit X.)

{¶ 38} On February 10, 2004, Dean Sanfilippo reported to the provost that the department had voted unanimously against recommending plaintiff for tenure, that the chairman of the department concurred with the decision, and that the college had also unanimously recommended against promotion and tenure. Dean Sanfilippo then informed the provost that based upon his evaluation of the documentation provided, plaintiff's performance had not met the expectations of the department or of the college and that, therefore, he also recommended that plaintiff not be promoted or awarded tenure. (Defendant's Exhibit Y.) Specifically, Dean Sanfilippo cited the falloff in plaintiff's productivity after coming to OSU, his inability to renew grant funding to support his research, and the fact that his theory regarding CD8+ cells had not been confirmed by any other investigator to date. (Defendant's Exhibit Y.) Dean Sanfilippo concluded by stating that "Dr. Saha's achievements fall well below what we would expect for someone who is essentially engaged full-time in research. The level of scholarly productivity prior to joining our faculty has not been maintained at an appropriate level. Although his work does appear to be innovative, and published in high impact journals,

---

[9]Several witnesses testified that the "impact factor" is a mathematical formula used to quantify the recognized prestige of a scientific journal and can range from a low of zero to 3.0, for an obscure or low-ranked journal; to a mid-range of 5.5 to 9, such as the Journal of Virology; up to a high of 27 to 30 for a publication such as Nature Medicine.

his level of productivity in recent years does not meet the expectations of our College." (Defendant's Exhibit Y.)

{¶ 39} Bornstein notified plaintiff of the negative recommendations on February 17, 2004, and notified plaintiff that he could respond in writing within the following ten days. Plaintiff submitted his rebuttal to the provost on March 1, 2004. Plaintiff insisted that the denial of tenure was based upon the "biased and discriminatory attitude by the Department influenced by a deeply rooted personal vendetta from Dr. Phillip R. Johnson," rather than as a result of the previously-stated reasons such as: problems in securing funding, poor productivity, or concerns about plaintiff's commitment to his students. Plaintiff attempted to show departmental bias by comparing his dossier with those of three other candidates who achieved tenure with the department in 1999 and in 2002. In addition, plaintiff disputed the methods used by the department and the chairman in evaluating the quantity and quality of plaintiff's publications along with the significance of the impact factor and of his grant funding. Specifically, plaintiff continued to stress the amount of funding that he brought with him to OSU even though the department concentrated on the inadequacy of national grant funding subsequent to 2001. In addition, plaintiff insisted that based upon the scoring his proposal received, a previously denied grant application would soon be approved. Furthermore, plaintiff categorized his publications as satisfactory despite the department's criticism that they appeared to rely on data generated at Columbia and thus did not reflect research that originated at OSU.

{¶ 40} Plaintiff also referenced the circumstances surrounding his wife's untimely death and how the sequelae impacted his ability to publish additional papers from his OSU research. In addition, plaintiff related that as a result of the abrupt termination of his internal support in 2002, "I've hardly anyone working in the lab at the present time * * *. Thus, the research progress and publication that I have made during my 'tenure-track' period at Children's Hospital was virtually the result of our past 3 and half years of full-fledged research even though I've been here over 5 years." (Defendant's Exhibit BB.)

{¶ 41} Next, plaintiff dismisses the allegations that he improperly supervised his students as having no merit. Indeed, plaintiff describes these allegations as "a case built on absolute fabrication and lies with an ulterior motive to oust me from the center." (Defendant's Exhibit BB.) Finally, plaintiff alleges that the department and the college

have violated the P&T guidelines in the manner in which external evaluators were selected.

{¶ 42} Dean Sanfilippo was not swayed by plaintiff's comments and on March 5, 2004, he notified the provost that plaintiff's performance and achievement did not merit promotion or tenure. (Defendant's Exhibit CC.)  In his letter, the dean stated that plaintiff had made "frequent assertions and allegations about ulterior motives of the department and college in recommending against his promotion and tenure.  I am unaware of any such biases or motivations, and am of the opinion that the evaluation conducted in this case was appropriate.  * * *  Given that his primary focus and commitment was in research, his level of productivity is insufficient to warrant promotion.  * * *  I am therefore not persuaded by Dr. Saha's arguments, and continue to believe that his overall record of performance and achievement does not merit promotion or tenure." (Defendant's Exhibit CC.)

{¶ 43} The six members of the university P&T committee reviewed plaintiff's case on March 5, 2004, and they voted unanimously against recommending plaintiff for promotion or tenure.  (Defendant's Exhibit DD.)  Plaintiff was notified by Bornstein on April 19, 2004, that his contract would not be renewed and that his employment would terminate on June 30, 2005.

{¶ 44} After denial of tenure was recommended for approval at all three levels, plaintiff filed an appeal to defendant's Center for Academic Freedom (CAFR).  The CAFR reviewed plaintiff's appeal in January 2005, and expressed concern that a small percentage of eligible voting faculty actually participated in the vote at the department level and that one of the external reviewers may have been improperly selected.  Thus, CAFR sent plaintiff's appeal to the faculty hearing committee for review.  The hearing panel found "no specific procedural violations" and that the department "conducted its evaluation in a reasonable fashion."  Nonetheless, the panel concluded that the department's approved procedure of allowing tenure decisions to be made by a minority of the eligible voting faculty was "fundamentally unfair." (Defendant's Exhibit JJ.)  The panel viewed that part of the process as flawed and determined that, at a minimum, plaintiff was entitled to another vote wherein a quorum of eligible faculty members voted.  The panel purportedly reported those findings to the provost on June 15, 2005.

{¶ 45} From the testimony and evidence presented, the court finds that there was a great deal of confusion about how to proceed once the final result became known to

the department inasmuch as plaintiff's employment was scheduled to end in two weeks. The department moved quickly to assemble a quorum of eligible voting faculty and a re-vote occurred on June 20, 2005.[10] The vote was recorded as one for promotion and tenure, and 26 against. (Defendant's Exhibit MM.)[11]

{¶ 46} On July 1, 2005, John Barnard, interim president of CRI, notified plaintiff that Bornstein had notified CRI of the non-renewal and that, inasmuch as plaintiff no longer held a faculty appointment, he was ineligible to continue in his position with CRI. The letter sent by Barnard notified plaintiff that he had been placed on administrative leave of absence and that his employment with CRI terminated on July 15, 2005. (Defendant's Exhibit ZZ.)

{¶ 47} Plaintiff asserts that he was denied tenure as the result of deceptive practices committed by one or more employees of defendant, that he was denied the opportunity both to defend his record and to fully present his accomplishments during the tenure review process and that, by the denial of tenure, plaintiff was discriminated against based upon his race and national origin. Plaintiff contends that he was prevented from meaningfully participating in any part of the second review and that he should have received a full and complete re-review, including opportunities to present rebuttal at every level. Plaintiff also insists that defendant was required to conduct the second review according to the same policies and procedures that governed the initial tenure review but that defendant's employees failed to follow such university policies and procedures and merely conducted a re-vote. In essence, plaintiff argues that there were several irregularities and mistakes which tainted the entire process.

{¶ 48} Defendant denies liability and contends that the tenure review process was conducted in accordance with OSU's internal policies and procedures, that plaintiff was offered opportunities to present rebuttal evidence, and that plaintiff was not denied tenure on the basis of his race or national origin. As to the re-review, defendant argues that only a re-vote was authorized, rather than a complete review of all the documents

---

[10]Although the department assembled a larger group of eligible faculty members and voted on June 20, 2005, plaintiff was notified on June 22, 2005, that the hearing panel had not formally met with the vice-provost until June 21, 2005, and that together, they had made the decision to remand plaintiff's case to the department for reevaluation. (Defendant's Exhibits PP, QQ.)

[11]Plaintiff also received a negative recommendation from the college and university levels, such that on September 26, 2005, he received notification from the provost that his request for tenure had been denied and that there were no further academic appeals available to him. (Defendant's Exhibit XX.)

in plaintiff's dossier. In addition, defendant asserts that OSU has no written rules, regulations, policies, or procedures that govern either the re-vote or the re-review process, and that even assuming a re-review was in order, such procedure does not contemplate the introduction of new documents not already submitted. Defendant further maintains that all of the named state employees are entitled to immunity.

**CIVIL IMMUNITY**

{¶ 49} Plaintiff has requested that the court make a determination as to whether defendant's employees, Drs. Johnson, Hansen, Fisher, Bakaletz, Walker, Morrow, and Barnard, are entitled to civil immunity pursuant to R.C. 9.86 and 2743.02(F).

{¶ 50} R.C. 2743.02(F) provides, as follows:

{¶ 51} "A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action."

{¶ 52} R.C. 9.86 provides, in part, that "no officer or employee [of the state] shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were *manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.*" (Emphasis added.)

{¶ 53} In *Thomson v. University of Cincinnati College of Medicine* (Oct. 17, 1996), Franklin App. No. 96API02-260, the Tenth District Court of Appeals noted the following: "Under R.C. 9.86, an employee who acts in the performance of his duties is immune from liability. However, if the state employee acts manifestly outside the scope of his or her employment or acts with malicious purpose, in bad faith, or in a wanton or reckless manner, the employee will be liable in a court of general jurisdiction. * * * Even if an employee acts wrongfully, it does not automatically take the act outside the scope of the employee's employment even if the act is unnecessary, unjustified,

excessive, or improper. *Thomas v. Ohio Dept. of Rehab. and Corr.* (1988), 48 Ohio App.3d 86. The act must be so divergent that its very character severs the relationship of employer and employee. *Wiebold Studio, Inc. v. Old World Restorations, Inc.* (1985), 19 Ohio App.3d 246."

{¶ 54} After careful consideration of the testimony and evidence presented, the court finds that Drs. Johnson, Hansen, Fisher, Bakaletz, Walker, Morrow, and Barnard acted within the course and scope of their employment with defendant at all times relevant to the issues related to plaintiff's promotion and tenure review. In addition, the court finds that plaintiff failed to prove, by a preponderance of the evidence, that the above-listed individuals acted with malicious purpose, in bad faith, or in a wanton or reckless manner toward plaintiff. Consequently, the court finds that Drs. Johnson, Hansen, Fisher, Bakaletz, Walker, Morrow, and Barnard are entitled to civil immunity pursuant to R.C. 2743.02(F) and 9.86 and that the courts of common pleas do not have jurisdiction over civil actions against them based upon allegations made in this case.


**BREACH OF CONTRACT**

R.C. 2743.02(E) provides in relevant part that the "only defendant in original actions in the court of claims is the state." As such, the court lacks jurisdiction over plaintiff's claims in regard to actions taken on behalf of CRI, which include the decision by Johnson to terminate plaintiff's internal support and the alleged failure by CRI to provide plaintiff with timely notice of his termination from CRI in 2005.

Plaintiff also asserts that OSU failed to abide by its procedures governing tenure review and that such failure amounted to a breach of his employment contract. According to plaintiff, when OSU initiated the final review in October 2003, the timing of such was premature inasmuch as it occurred immediately after plaintiff's fifth-year review, and that the sixth-year review was scheduled less than two years after his fourth-year review. Plaintiff alleges that OSU violated the Office of Academic Affairs (OAA) Policies and Procedures Handbook sections IX and X. The relevant portion of Section IX states as follows: "Faculty hired in March or later are on the same schedule as persons hired September through December of the same calendar year." (Plaintiff's Exhibit 8.) Thus, the court finds that plaintiff's first calendar-year review covers the period of time from June 1998 through June 1999; for year two, June 1999-June 2000; for year three, June 2000-June 2001; for year four, June 2001-June 2002, with the

fourth-year review to occur during the fourth academic year, between late 2001 and early 2002; then for year five, June 2002-June 2003; and finally, for year six June 2003-June 2004 with the sixth-year review to commence in the Fall of 2003.

In light of the parameters outlined above, the court finds that OSU did not violate its policy and that the timing of plaintiff's annual and mandatory reviews overlapped due in large part to plaintiff's prolonged absence from the department (which occurred at the same time as the scheduled fourth-year review) and to plaintiff's inability to submit the required documents to the department in a timely fashion. There was ample evidence submitted to establish that plaintiff had difficulty compiling the dossier from abroad and that he attempted to delegate some of his responsibility to his support staff while he was in India in 2002. (Defendant's Exhibit E.) The court finds that plaintiff then spent a significant portion of his time over the next several months attempting to reverse the initial negative recommendation, which adversely impacted his research and productivity. As to plaintiff's contention that there must be a two-year interval between the fourth-year and sixth-year reviews, the court finds that plaintiff's reliance on the language of Section X is misplaced. Specifically, the policy states that the fourth-year review "takes place for most probationary faculty in the actual fourth year of service as an assistant professor at Ohio State" and that it may not occur "in any year other than the actual fourth year * * * except in the circumstances stated below:

"Formally approved Prior Service Credit * * *.

"Exclusion of time from probationary period under Faculty Rule 3335-6-03 prior to the actual fourth year of service * * *.

"Extended probationary period (up to 9 years depending on FTE) due to a part-time appointment." (Plaintiff's Exhibit 9.)

Thus, under the third exception, the policy states that the fourth-year review "may be postponed, but must occur at least two calendar years prior to the mandatory promotion and tenure review year." (Plaintiff's Exhibit 9.) The court finds that there was no evidence presented to establish that such exception applied to plaintiff's situation.

In *Bleicher v. Univ. of Cincinnati College of Med.* (1992), 78 Ohio App.3d 302, 308, citing *Regents of the Univ. of Mich. v. Ewing* (1985), 474 U.S. 214, 225, the Tenth District Court of Appeals stated that "the trial court was to defer to academic decisions of the college unless it perceived '* * * such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not

actually exercise professional judgment.'" Subsequently, the appellate court held that "'it is clear that courts must be vigilant not to intrude into [faculty employment] * * * determination[s], and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges. * * *'" *Gogate v. Ohio State Univ.* (1987), 42 Ohio App.3d 220, 226, quoting *Kunda v. Muhlenberg College* (C.A.3, 1980), 621 F.2d 532, 548.

Likewise, the Tenth District Court of Appeals held that "[t]eaching, research and service simply cannot be evaluated solely on the basis of objective factors. In *Lovelace v. Southeastern Massachusetts University* (C.A.1, 1986), 793 F.2d 419, 422, the court noted that in tenure decisions, universities traditionally have enjoyed wide discretion in exercising what is largely a subjective judgment and that in specifying in writing the criteria for promotion, such as teaching, scholarship and service, the university does not thereby set objective criteria and constrict its discretion. * * * Indeed, while one may publish over and above the amount required by a university, the quality of such publications often is more important than quantity and the measure of quality is largely subjective. Likewise, teaching style and one's approach to teaching a course surely can be properly considered in tenure decisions, yet such an evaluation can be very subjective." *Kirsch v. Bowling Green State Univ.* (May 30, 1996), Franklin App. No. 95API11-1476.

The court finds that plaintiff failed to establish that the CEVR, the college, or the university committees did not carefully consider plaintiff's dossier and the court concludes that the committees fulfilled their responsibility to review and assess plaintiff's qualifications. In addition, the court finds that plaintiff was provided ample opportunity to submit rebuttal responses at each stage of the tenure review and that his responses were carefully considered and addressed.

The standard of review is not merely whether the court would have decided the matter differently but, rather, whether the faculty action was arbitrary and capricious. See *Bd. of Curators of Univ. of Mo. v. Horowitz* (1978), 435 U.S. 78, 91. In the instant

case, the faculty members involved in the initial vote and in the re-vote worked in the same department with plaintiff, thus they were the most knowledgeable with regard to plaintiff's research   performance and his potential.   Moreover, it is well within the province of the department to assess plaintiff's commitment to the department and its needs in contrast with plaintiff's autonomy in extending his planned absences unilaterally and without seeking prior approval from the department.

The parties disagree whether CAFR's decision mandated a full review or merely another vote.  Further, the parties dispute what policies and procedures, if any, govern the faculty during a second look at their decision regarding a recommendation as to tenure. Upon review, the court finds that OSU does not have a clearly defined policy governing a re-review and that the testimony confirmed that a re-review rarely happens. Accordingly, the court finds that the re-vote was a sufficient response to the CAFR hearing panel's singular concern regarding the number of eligible faculty present for the initial departmental vote.  In addition, plaintiff has failed to convince the court that a full re-review, even if authorized or required, would have resulted in any different outcome given the overwhelming consensus of the faculty up to that point in the process.

In the final analysis, the court finds that plaintiff was either careless or negligent in managing his responsibilities at CRI.   Consequently, plaintiff's inattention to his responsibilities, including his failure to submit his dossier in a timely fashion, resulted in a cascade of circumstances which ultimately led to the denial of tenure.   Despite plaintiff's protestations to the contrary, the court attributes much of the fault to plaintiff's lack of attention to the most pressing academic and employment matters.


**BAD FAITH BREACH OF CONTRACT/BAD FAITH TORT**

As to Counts Two and Three, defendant argues that plaintiff's complaint fails to state a cause of action by alleging bad faith in relation to the termination of the employment contract.   Defendant asserts that plaintiff's claim of "bad faith" must fail inasmuch as Ohio does not recognize a separate cause of action in tort for violation of a contract, with the exception of insurance contracts.  See *Brandenburger v. Hilti, Inc.* (1989), 52 Ohio App.3d 21, 27-28, (holding that a cause of action in tort for the breach of the duty of good faith exists only in the context of an insurance contract).

"Likewise, Ohio law is clear that it is 'no tort to breach a contract, regardless of motive.' *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St. 3d 272, 276, 452 N.E.2d 1315;

see, also, *Canderm Pharmacal v. Elder Pharmaceuticals, Inc.* (1988), 862 F.2d 597, 602; *Jurgens Real Estate Co. v. R.E.D. Constr. Corp.* (1995), 103 Ohio App.3d 292, 296, 659 N.E.2d 353." *Labate v. National City Corp.* (1996), 113 Ohio App.3d 182, 189-190. Based upon the holdings cited above, Counts Two and Three are hereby DISMISSED.

**RACE/NATIONAL ORIGIN DISCRIMINATION**

In support of his discrimination claim, plaintiff asserts that he was treated differently and evaluated for tenure via different criteria than other similarly-situated Caucasion candidates. Specifically, plaintiff references the way that publications were credited to candidates, the variable importance assigned to achievement of grant funding, and the manner in which one's professional reputation, whether national or international, was presented to the P&T committee. Plaintiff testified extensively about the dossiers of four other candidates who were either promoted or granted tenure in the department. The four candidates were Reed Clark, Joan Durbin, Michael Robinson, and Thomas Sferra. Of the four, three received tenure and Sferra was promoted to Associate Professor without tenure and he left OSU after the following year.

Disparate treatment discrimination has been described as "the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Teamsters v. United States* (1977), 431 U.S. 324, 335-336, fn. 15. In a disparate treatment case, liability depends upon whether the protected trait actually motivated the employer's decision. *Hazen Paper Co. v. Biggins* (1993), 507 U.S. 604, 610. "Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." Id.

Plaintiff may establish a prima facie case of race discrimination either by direct evidence or by the indirect method established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792. Given that there was no direct evidence presented, plaintiff may, under *McDonnell Douglas*, suggest an inference of discriminatory intent by establishing that plaintiff: 1) was a member of a protected class; 2) suffered an adverse employment action; 3) was qualified for the position held; and 4) that comparable, nonprotected persons were treated more

favorably.  Id.  See also *Austin v. Ohio Dept. of Admin. Servs.*, Ct. of Cl. No. 2007-05202, 2008-Ohio-7051, following *McDonnell Douglas.*

The parties do not dispute that plaintiff was in a protected class and that, because he was not granted tenure, his employment at OSU was terminated.  OSU contends that plaintiff's productivity had waned and that he was not meeting expectations of the department in terms of his research.  In addition, his peers at CRI continued to express concern that in light of plaintiff's prolonged absences from the department, he was not displaying the level of commitment to teaching that was expected.

In regard to his qualifications for tenure, plaintiff admitted that his research had suffered due in part to the lack of internal funding and the testimony and evidence adduced at trial established that plaintiff's theories about CD8+ cells had not yet been confirmed or reproduced by other scientists.

Upon review of the testimony and evidence presented, the court finds that plaintiff failed to present sufficient evidence to meet his burden with respect to the third element necessary to prove indirect racial discrimination.  The court finds that sufficient credible evidence was adduced at trial to show that plaintiff's research productivity and grant funding did not meet the expectations of the department, the college, or the university.

As to the fourth prong, the case law in Ohio makes clear that plaintiff must show that the other persons referenced were comparable in all respects.  *Mitchell v. Toledo Hosp.* (C.A.6, 1992), 964 F.2d 577, 582.  As such, "'plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated; rather, * * * the plaintiff and the employee with whom the plaintiff seeks to compare himself * * * must be similar in 'all of the relevant aspects.'  The individuals with whom the plaintiff seeks to compare * * * [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the *same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  (Emphasis added.)  *Clark v. City of Dublin,* Franklin App. No. 01AP-458, 2002-Ohio-1440; quoting *Ercegovich v. Goodyear Tire & Rubber* (C.A. 6, 1992), 154 F.3d 344-352*.*  (Additional citations omitted.)

Upon review of the testimony and other evidence presented, the court finds that plaintiff failed to prove that the persons whom he alleges were treated more favorably were similar to him in all relevant respects.  The court notes that two of the candidates referenced, Durbin and Sferra, were clinicians rather than researchers, and that while Sferra was promoted to Associate Professor, he was denied tenure.  In addition, Clark and Robinson each operated core laboratories in the department which supplied valuable research materials that were viewed within the department as vital to the ongoing research at CRI.  Plaintiff did not operate a core laboratory and according to Hansen, his productivity was trailing off rather than "ramping up" as expected.

For the foregoing reasons, the court concludes that plaintiff failed to sustain his burden of proof that he was discriminated against on the basis of his race, that he was treated less favorably as a result of his race, or that the decision to terminate his employment was racially motivated.


**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

To state a cause of action for intentional infliction of emotional distress, plaintiff must show that:  1) defendant intended to cause emotional distress, or that defendant knew or should have known that its actions would result in serious emotional distress; 2) defendant's conduct was extreme and outrageous; 3) defendant's actions proximately caused plaintiff's psychic injury; and 4) the mental anguish plaintiff suffered was serious. *Hanley v. Riverside Methodist Hosp.* (1991), 78 Ohio App.3d 73, 82, citing *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, 34.  However, the court finds that plaintiff has failed to prove that Bale's conduct was extreme and outrageous.

In *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 375, quoting Restatement of the Law 2d, Torts (1965) 73, Section 46, comment d, the court explained that "'[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous'!"

Plaintiff testified that he was shocked when he was confronted by Johnson in 2002 and accused of abandoning his job.  The court notes that although Johnson's decision to terminate plaintiff's internal support may have been abrupt and

unanticipated, such conduct occurred in the context of Johnson's role with CRI, not his employment with OSU. Even assuming that Johnson's actions could be viewed as having occurred within the course and scope of Johnson's state employment, the court cannot find that his conduct was "utterly intolerable in a civilized community." According to the offer of employment, renewal of the start-up package was conditional and subject to review on an annual basis. As plaintiff's supervisor, Johnson had expressed displeasure with plaintiff's unilateral decision to extend his stay in India without seeking prior approval from the department as well as from CRI. Plaintiff had failed to apprise his peers and supervisor at CRI that he had requested approval for a personal leave of absence from OSU and there was clearly a breakdown of communication while plaintiff was in India. Johnson had the authority both to administer CRI's resources and to maintain operations that best suited the interests of CRI and he also had an overall responsibility to ensure that students received an optimal learning experience while at CRI.

In addition, the court finds that the circumstances surrounding the tenure review process fall far short of conduct that would be considered outrageous and utterly intolerable. Moreover, plaintiff failed to show that he suffered severe and debilitating emotional distress as a result of the actions he attributed to Hansen, Fisher, or Johnson. Therefore, the court finds that plaintiff has failed to establish a claim for intentional infliction of emotional distress.

**DEFAMATION**

Plaintiff alleges that he was slandered by Hansen, Johnson, and Fisher with regard to the accusations that he was not properly mentoring his students during his extended absences while in India. To establish a claim for defamation, plaintiff must prove by a preponderance of the evidence that a false publication caused injury to his reputation, or exposed him to public hatred, contempt, ridicule, shame, or disgrace, or affected him adversely in his trade or business. *Ashcroft v. Mt. Sinai Medical Ctr.* (1990), 68 Ohio App.3d 359, 365.

Although plaintiff insists that the comments and criticisms are unfounded, the court finds that Johnson and Fisher continued to have reasonable concerns in the context of plaintiff's absence and lack of attention to his responsibilities at CRI. The court further finds that Johnson's concerns were reasonably supported by the testimony

and evidence presented. Specifically, the court finds that based upon plaintiff's testimony, his perceptions and perspective as to his supervisory abilities and his research accomplishments, as well his qualifications to be awarded tenure are somewhat skewed. For example, plaintiff admitted in various e-mails and some of his rebuttal letters that his students and support staff did experience difficulties in maintaining consistent and effective communication with him during both trips to India. Plaintiff even suggested that he could "make up" the lost productivity after he returned to his laboratory in 2002.

In addition, plaintiff stresses that his absences were planned and approved while overlooking the department's position that in both instances plaintiff extended his stay abroad without prior approval and without proper notice to CRI or to OSU. The court further finds that plaintiff's absences from CRI and his unprecedented failure to submit his dossier on time created a pervasive perception among his peers that he was not committed either to his research or his teaching. Thus, plaintiff was judged negatively by his peers based upon the perception that plaintiff could not have adequately supervised his laboratory during his prolonged absences, that his absences were unapproved, at least prospectively, and that his productivity naturally suffered and ultimately fell below expectations.

Plaintiff insists that the statements were untrue and that they caused both the chairman and the associate dean to view him unfavorably. Defendant argues that the comments were expressions of opinion; that they were not malicious; and that they are protected by qualified privilege.

"[E]xpressions of opinion are 'generally protected' under Section 11, Article I of the Ohio Constitution." *Condit v. Clermont Cty.Review* (1996), 110 Ohio App.3d 755, 759. (Citations omitted.) "To determine whether a statement is fact or opinion, Ohio courts employ a totality of the circumstances test. Under this test, courts should consider: 'the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared.' This is not a 'bright-line' test; instead, the standard is fluid. The facts of each case must be analyzed in the context of the general test. Each of the four factors should be addressed, but the weight given to any one will conceivably vary depending on the circumstances presented." Id. (Internal citations omitted.)

A court is required to analyze "the specific language to determine 'whether a reasonable reader would view the words used to be language that normally conveys information of a factual nature or hype and opinion.'" *Cooke v. United Dairy Farmers, Inc.*, Franklin App. No. 04AP-817, 2005-Ohio-1539, ¶21; quoting *Vail*, supra, at 282.

Upon review, the court finds that the statements are capable of verification, but that they are also subject to interpretation such that they have the appearance of opinion. The court heard testimony that plaintiff's extensions of his approved leave were absences that were unplanned and that he sought approval for the leave from the department after the fact. In addition, it is clear to the court that there was ample evidence to substantiate that communications between plaintiff and his lab were spotty, inconsistent, and that his absence negatively affected his productivity. Despite the fact that the students acknowledged having positive experiences in plaintiff's laboratory, the faculty at CRI assessed plaintiff's commitment to teaching and research on an academic standard of excellence. Thus, the standard is not whether the students quantified their experiences as being positive, but rather whether the faculty viewed plaintiff as exhibiting the leadership and supervision expected of a primary researcher. Consequently, the court finds that plaintiff failed to prove by a preponderance of the evidence that the communications were patently false.

Even if the court could find the communications to be false and defamatory, the court notes that defendant would be protected from liability for such statements by qualified privilege. In *McKenna v. Mansfield Leland Hotel Co.* (1936), 55 Ohio App. 163, 167-168, qualified privilege is explained as follows:

"A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society and he should tell third persons certain facts, which he in good faith proceeds to do.

"The preponderance of authority supports the view that communications between an employer and an employee, or between two employees, concerning the conduct of a third employee or former employee, are qualifiedly privileged, and thus, even though such a communication contain matter defamatory to such other or former employee, he

cannot recover in the absence of sufficient proof of actual malice to overcome the privilege of the occasion.

"A communication between officers of a corporation on the subject of the conduct of one of its servants is privileged." (Internal citations omitted.)

In accordance with this precedent, even where the communication is found to be defamatory, it may be protected by a qualified privilege unless there is sufficient proof of actual malice. The court finds that the comments made by Johnson, Hansen, and Fisher were well within the interests of the employer. Inasmuch as they were attempting to explain or justify the department's recommendation against tenure, those statements were privileged.

A plaintiff may defeat a claim to qualified privilege only by proving "with convincing clarity that a publisher acted with actual malice." *Mason v. Bexley City Sch. Dist.* (Mar. 15, 2010), S.D.Ohio No. Civ.A. 2:07-CV-654; quoting *Jackson v. City of Columbus*, 117 Ohio St.3d 328, 331, 2008-Ohio-1041. Actual malice "is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." *Jacobs v. Frank* (1991), 60 Ohio St.3d 111,116. "The phrase 'reckless disregard' applies when a publisher of defamatory statements acts with a 'high degree of awareness of their probable falsity,' or when the publisher 'in fact entertained serious doubts as to the truth of his publication.'" *Jackson*, supra, at 331. (Internal citations omitted.)

Here, plaintiff has failed to provide convincing evidence to establish that Johnson, Hansen, or Fisher acted with reckless disregard as to the truth or falsity of the comments made about plaintiff and his qualifications for tenure. Therefore, the court concludes that plaintiff has failed to prove his claim of defamation by a preponderance of the evidence.

**UNJUST ENRICHMENT**

As to Count Seven, plaintiff claims that OSU was unjustly enriched by retaining the benefits generated from his research, his ability to secure a patent, and his grant funding. Based upon the evidence adduced at trial, the court finds that such "efforts were within the ambit of his responsibilities." *Shaw v. J. Pollock & Co.* (1992), 82 Ohio App.3d 656, 663. Inasmuch as plaintiff was fully compensated during the years that he

was employed, his claim that OSU was unjustly enriched by the accomplishments expected of him must fail.

For the foregoing reasons, judgment shall be rendered in favor of defendant.


# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us


KUNAL SAHA

    Plaintiff

    v.

THE OHIO STATE UNIVERSITY

    Defendant
    Case No. 2007-02050

Judge Joseph T. Clark

JUDGMENT ENTRY


This case was tried to the court on the issue of liability and for a determination as to the civil immunity of defendant's employees pursuant to R.C. 9.86 and 2743.02(F). Upon hearing all the evidence and for the reasons set forth in the decision filed concurrently herewith, the court finds that Drs. Phillip Johnson, Thomas Hansen, David Fisher, Lauren Bakaletz, Christopher Walker, Grant Morrow, and John Barnard are entitled to immunity pursuant to R.C. 9.86 and 2743.02(F) and that the courts of common pleas do not have jurisdiction over any civil actions that may be filed against them based upon the allegations in this case. In addition, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant.

Court costs are assessed against plaintiff.  The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Amy S. Brown                          D. Joe Griffith
Randall W. Knutti                     Nicholas R. Grilli
Assistant Attorneys General           144 East Main Street
150 East Gay Street, 18th Floor       P.O. Box 667
Columbus, Ohio 43215-3130             Lancaster, Ohio 43130

SJM/cmd
Filed November 9, 2010/To S.C. reporter December 1, 2010